Jack **GERRITSEN**, Plaintiff–Appellant,

v.

**CITY OF LOS ANGELES**, et al., Defendants–Appellees.

Jack **GERRITSEN**, Plaintiff–Appellant,

v.

**CITY OF LOS ANGELES**, et al., Defendants–Appellees.

Nos. 91–55470, 92–55103.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 3, 1993.

Decided May 14, 1993.

---

**572**

Jack Gerritsen, Monterey Park, CA, for plaintiff-appellant.

Robert Kujima, Ronald T. Pohl, and Janet G. Bogigian, Los Angeles City Atty.'s Office, Los Angeles, CA, for defendants-appellees City of Los Angeles and its employees.

Before: D.W. NELSON, WIGGINS, and LEAVY, Circuit Judges.

D.W. NELSON, Circuit Judge:

## I. OVERVIEW

Appellant Jack Gerritsen ("Gerritsen") has strongly held opinions about the Mexican government and United States–Mexico relations. Gerritsen has sought to express these views by distributing literature, giving speeches, organizing rallies, and utilizing a variety of other protest activities throughout the greater Los Angeles area.

Appearing *pro se* below and before this court, Gerritsen brought these two actions under 42 U.S.C. § 1983 (1988) for deprivation of his First Amendment rights.[1] The suits culminated in judgments for the defendants-appellees—the City of Los Angeles ("the City") and several of its employees—after separate bench trials.[2] The cases have been consolidated on appeal as they raise similar issues and involve many of the same defendants.

We affirm the district court as to most of Gerritsen's claims, but reverse as to those involving the City's policies on handbill distribution in a public park. We hold that the City's ban on handbill distribution in certain areas of a public park and its permit scheme for handbill distribution in other areas of the park are not valid time, place or manner restrictions on protected speech in a public forum.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Each year approximately two million people visit El Pueblo de Los Angeles State Historic Park ("El Pueblo Park"), located in downtown Los Angeles. The park was established to commemorate the City's Mexican heritage and recognize its present-day Mexican-origin population. In addition to a plaza area with an open-air bandstand, El Pueblo Park contains the Olvera Street shopping and dining area with 78 businesses, the Plaza Catholic Church and the Biscailuz Building which houses the Mexican Consulate. The City's Board of Recreation and

---

1. Section 1983, in relevant part, reads as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress." 42 U.S.C. § 1983 (1988).

   The First Amendment provides, in part: "Congress shall make no law ... abridging the freedom of speech...." The Due Process Clause of the Fourteenth Amendment has been construed to extend the Bill of Rights to the States, *e.g.,* *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

2. Although this appeal involves only defendants the City of Los Angeles and its employees, there were initially more than two dozen defendants in these two cases.

   In No. 91–55470, the initial group of defendants included several municipalities (and their employees) and two private security companies (and their employees). Most of the defendants were dismissed before trial upon their own motions. One of the security companies reached a pre-trial settlement with Gerritsen and was subsequently dismissed. Gerritsen prevailed against Trojan Security Company, several of its employees, the City of Bell, and a Bell police officer.

   Case No. 92–55103 initially involved the City of Los Angeles, several of its employees, and a third security company. The defendant Coleman Security Service, Inc. failed to respond to the complaint, and the court entered a default judgment against them.

Parks sets policy for the park and controls its day-to-day operations.

Gerritsen has distributed his literature and made speeches in a variety of cities and parks in the Los Angeles area, but El Pueblo Park is one of his favorite sites because of its many Mexican American and Mexican visitors. He believes this audience is more likely than others to be receptive to his message critical of policies of the Mexican government and the United States' relationship with Mexico. He estimates that between 1986 and 1991, the period during which he claims his rights were violated by the City and city officials, he visited the park 400 times and distributed more than 50,000 handbills in El Pueblo Park.[3]

During Gerritsen's visits to the park, he has had a number of conflicts with employees of the park's security force, park administrators, officers of the Los Angeles Police Department, and representatives of the Mexican Consulate.[4] Gerritsen testified to numerous incidents of harassment, verbal and physical intimidation, detention, arrest, and physical assault by park security guards, Mexican Consulate security officers, and Los Angeles police officers. At trial, the City argued that its official policy was not to enforce the policies, claimed that all of these altercations were provoked by Gerritsen, and portrayed Gerritsen as an uncontrollable protestor.

On August 11, 1983, in response to conflicts between Gerritsen and park administrators and security guards, the City's Board of Recreation and Parks Commission enacted provisions regarding handbill distribution in El Pueblo Park.[5] Prior to the enactment of this policy, there was no formal policy concerning the distribution of literature in the park. The City concedes that these provisions were prompted solely by Gerritsen's political activity in the park and were the result of consultations between El Pueblo Park Director Jerry Smart and the City Attorney's office. The guidelines have never been repealed.

The 1983 guidelines contain two basic policies. First, the so-called blue line policy prohibits *all* handbill distribution in certain areas of the park (indicated by blue demarcations on the pavement). These areas include two of the park's most popular areas—the area around the Mexican Consulate and the Olvera Street merchants area. The second policy establishes a permit scheme for limited handbill distribution in other areas of the park. According to the regulations, "the Park Director shall issue a permit immediately on proper application" unless one of five specified grounds for denial exist.[6] If the director denies the permit, he is required to inform the applicant in writing and to specify the reasons for the denial.

Both park director Jerry Smart and Gerritsen testified at trial that Smart informed Gerritsen of the new rules regarding handbill distribution in the park shortly after their passage. About a month later, Gerritsen filed the first of hundreds of applications for permits to distribute literature. In some cases Gerritsen received permits, but in other cases he was denied permission to distribute literature. Sometimes the denials were based upon one of the reasons in the written Guidelines; on other occasions, the director hand-wrote a reason for denying the permit which did not appear on the permit form.

---

**3.** Most of these handbills were letter-sized, photocopied sheets with type-written text. Gerritsen usually protests as an individual, but he also heads an organization, the Association for Democracy in Mexico. Many of the handbills contain the Association's name and list Gerritsen as a contact person.

**4.** Gerritsen also sued several officers of the Mexican Consulate in a case recently dismissed by this court. *See Gerritsen v. Consulado General de Mexico, et al.,* 989 F.2d 340 (9th Cir.1993).

**5.** The provisions formally are titled "Guidelines for Solicitation of Donations and the Distribution

of Printed Material at El Pueblo de Los Angeles State Historic Park" and map. *See* Appendix A.

**6.** The listed grounds for permit denial are the following: (1) a prior permit has been granted for the same area, which is too small for multiple permits; (2) a danger to public health or safety will result; (3) the applicant desires too many persons to engage in the proposed distribution; (4) distribution is prohibited in the target location (e.g., the blue-line areas); (5) the activity would constitute a violation of local, state or federal law.

Gerritsen testified that he initially did not distribute literature in the blue-line areas, but that he later distributed handbills through-out the park, regardless of whether he received permits to do so. He stated that he would have distributed even more handbills had the permit policy not been in existence.

Although the City Attorney's office helped draft the provisions, that office later advised park officials not to enforce either the blue-line ban or the permit scheme. The parties dispute exactly when the City ceased enforcing the policies. In the first trial, park director Smart testified that he attempted to enforce the blue-line ban into early 1984. In the second trial, Smart testified that he stopped enforcing the blue-line ban within two months of the Board's enactment of the provisions, sometime in October 1983. Gerritsen contends that park officials continued to enforce the blue-line ban well into 1986 and that, even after that time, they "unofficially" enforced the provision.

The permit provision was in effect considerably longer than the blue-line policy. Park director Smart testified that the permit policy was in effect until "sometime in 1985." He also testified, however, that even after the permit policy was "officially" withdrawn, the City Attorney directed him to keep permit applications on file. Smart continued to accept Gerritsen's applications for permits—and continued to approve or deny them—throughout 1988. Gerritsen testified that, even after Smart directed park security guards to stop enforcing the permit policy, the guards continued to harass Gerritsen about his political activities and detained him on more than 20 occasions:

> These permit denials were enforced on many occasions by security guards. On numerous occasions, they would approach me and ask me for a permit. When I could not show them a granted permit, they would tell me to get out of the park or attempt to arrest me or handcuff me....

In addition to expressing political views by distributing literature at El Pueblo Park, Gerritsen sought to use street banners to convey his views. Between 1986 and 1989, Gerritsen submitted as many as 50 applications to the City to hang banners across various streets, mostly in the downtown area. The proposed banners included a variety of messages: "Mexico—World Class Drug Pusher;" "Viva la Revolucion;" "City Hall Sucks;" "Gay Liberation;" "Merry Christmas, Happy New Year;" "This Space Censored by the City of Los Angeles;" and, on one occasion, a completely blank banner. The City, through its Bureau of Street Maintenance, denied each of Gerritsen's banner permit applications.

Los Angeles Municipal Code § 62.132(m), which was substantially amended in 1942 and 1986, governs the hanging of street banners in the city. The City requires any person or organization wishing to hang a non-commercial banner across a city street to apply for a permit and post an insurance bond. The 1986 amendments allow only banners which announce "community, charitable and non-profit events which serve a civic and public interest." A designated official in the City's Bureau of Street Maintenance has discretion to grant or deny permits, subject to review by the Board of Public Works.

In 1987 and 1989 Gerritsen brought these Section 1983 claims against the City and numerous other defendants seeking compensatory damages.[7] Both suits resulted in bench trials (at which Gerritsen represented himself) and judgments in favor of the City and its employees. Both district courts found that the El Pueblo Park guidelines were not enforced by the City and, thus, that they were not applied to Gerritsen. Thus, neither court reached the merits of Gerritsen's claim that the blue-line ban and the permit scheme are unconstitutional. Gerritsen timely appealed to this court, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

### III. STANDARD OF REVIEW

This court reviews the district court's factual findings for clear error. *In re San Vicente Medical Partners, Ltd.,* 962 F.2d 1402, 1405 (9th Cir.), *cert. denied,* ——

---

7. Gerritsen did not request injunctive relief or punitive damages.

U.S. ——, 113 S.Ct. 210, 121 L.Ed.2d 150 (1992). We review the district court's legal conclusions de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). However, we review First Amendment questions de novo since they present mixed questions of law and fact, "requir[ing] us to apply principles of First Amendment jurisprudence to the specific facts of this case." *ACORN v. Phoenix*, 798 F.2d 1260, 1263 (9th Cir.1986); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1227, n. 1 (9th Cir.1990).

## IV. THE HANDBILL DISTRIBUTION GUIDELINES

### A. *Was the policy applied to Gerritsen?*

■ Gerritsen argues that the City's policy regarding the distribution of handbills in El Pueblo Park is unconstitutional as applied to him. Specifically, he argues that neither the blue-line ban nor the permit scheme are valid time, place or manner restrictions on protected speech in public forums. The City, on the other hand, urges this court to uphold both district courts' findings that the El Pueblo Park regulations never were applied to Gerritsen, thereby voiding his *as applied* claim of unconstitutionality.[8]

Both district courts found that the park guidelines were not enforced against Gerritsen, and, as a result, that he was precluded from making an as applied challenge to their constitutionality. Yet the record conclusively supports Gerritsen's claim that the El Pueblo Park rules were applied to him for at least some period of time. Thus, we find that the district courts erred in concluding that the rules were not applied to Gerritsen.

8. On appeal, Gerritsen also makes a facial challenge to the El Pueblo Park guidelines. A plaintiff may bring a facial challenge "[w]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity...." *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2142–43, 100 L.Ed.2d 771 (1988); *see also Freedman v. Maryland*, 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1965); *Gaudiya Vaishnava Society v. San Francisco*, 952 F.2d 1059, 1062 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992).

The City conceded at trial that the handbill rules were aimed specifically at Gerritsen's activities in the park and that, immediately upon their enactment in early August, 1983, park officials informed Gerritsen of them. At some later point, the City Attorney's office directed park director Smart and those working with him to cease enforcing the policies. While Smart's testimony about the exact dates when he stopped enforcing the policy was inconsistent, the record indicates that both prongs of the policy were applied to Gerritsen for at least some period of time.[9]

Smart testified that the blue-line ban was enforced for between two and six months and that the permit policy was enforced for nearly two years. In addition to testimony about when he was directed to "stop enforcing" the policy, Smart testified that the City Attorney instructed him to keep permit applications on file well into 1986 and that he complied with this order. Moreover, between enactment of the guidelines in 1983 and 1988, Smart accepted and either approved or denied dozens of Gerritsen's permit applications.

For his part, Gerritsen argued that the park rules on handbill distribution were tacitly enforced even after Smart directed his subordinates and park security guards not to enforce the policy. Gerritsen testified that park officials' and security guards' enforcement of the policy towards him had a chilling effect on his protest activity. Although it is true that Gerritsen continued to visit the park and distribute his political literature (in both blue-line and other areas), he testified that he did not distribute as much literature and did not do so as frequently as he would have absent the park guidelines. In short, the evidence indicates that the El Pueblo Park regulations were applied to Gerritsen

We do not reach the issue of facial unconstitutionality, because we find, as an initial matter, that the guidelines were unconstitutional *as applied* to Gerritsen.

9. Park director Smart testified at both trials, but gave different dates for the enforcement period at each trial. The minimum period for which he claimed to have enforced the handbill regulations was two months, and the maximum period that he testified portions of it were enforced was two years.

for at least some period of time and that the district courts' findings to the contrary are clearly erroneous.

### B. *Constitutionality of the blue-line ban*

In evaluating an as applied First Amendment challenge, we must decide whether or not the plaintiff's activities are protected speech or conduct, whether the government restriction occurs in a public or non-public forum, and whether or not the restriction is a valid time, place or manner regulation. *See United States v. Grace*, 461 U.S. 171, 176–182, 103 S.Ct. 1702, 1706–1709, 75 L.Ed.2d 736 (1983).

Gerritsen's speech clearly is protected by the First Amendment—he attempted to distribute handbills discussing his political beliefs. In deciding whether or not the blue-line ban involved a public forum, the record reflects that the blue-line ban prohibited handbill distribution in two areas of the park: the Olvera Street merchants area and the sidewalk areas immediately surrounding the Mexican Consulate. Since public parks such as El Pueblo represent the quintessential public forum, the City bears the burden of distinguishing these particular areas of the park as "non-public" in nature. *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983); *see also Kreisner v. San Diego*, 988 F.2d 883, 893 (9th Cir.1993), ("Traditional public forums, such as parks and public streets, however, are open to all manner of speech, subject only to reasonable time, place and manner restrictions.").

The City argues that the blue-line areas are distinct from the rest of the park, which they concede is a public forum. It claims that the Olvera Street area is a distinctive section of the park, with a unique historic and cultural atmosphere which is designed to foster commercial exchange. It claims that the area around the Mexican Consulate is semi-private in nature and that it has particular functions to carry out which necessitate separation from activities in other areas of the park. We find these arguments unconvincing. While the Olvera Street area may have a special ambience, it is still part of the park and it is indistinguishable from other sections of the park in terms of visitors' expectations of its public forum status. Indeed, to many visitors, Olvera Street is the heart of El Pueblo Park. Similarly, the walkways and sidewalks leading up to and surrounding the Mexican Consulate are no different from others in the park. We find that the blue-line areas are indistinguishable from the park as a whole, and, thus, that these areas constitute a public forum.

In this respect, our conclusion is consistent with several cases where the Supreme Court and the lower federal courts have found sections of public forums to be one and the same with the larger, undisputed public forum in which they exist. *See Boos v. Barry*, 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988) (sidewalks are traditional public forum and sidewalks surrounding the Soviet and Nicaraguan embassies are indistinguishable from other public sidewalks); *Grace*, 461 U.S. at 177–78, 103 S.Ct. at 1706–07 (sidewalks are traditional public forum and sidewalks leading up to United States Supreme Court building are indistinguishable from other public sidewalks); *see also Henderson v. Lujan*, 964 F.2d 1179, 1182–83 (D.C.Cir.1992) (sidewalks near Vietnam Memorial are indistinguishable from other city sidewalks and so are public forum for First Amendment purposes); and, *Naturist Society v. Fillyaw*, 958 F.2d 1515, 1522 (11th Cir.1992) (parks are traditional public forum and beach area of state park is part of larger park and therefore a public forum).

Given that the blue-line areas are a public forum, the ban on handbill distribution must be a valid time, place or manner restriction if it is to pass constitutional muster. *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Such a restriction must (1) be content-neutral, (2) be narrowly tailored to serve a significant government interest, and (3) leave ample alternatives of communication. *Id.* at 791, 109 S.Ct. at 2753; *see also Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). The ban meets the first criterion, since it prohibits *all* handbills without regard to their content. It also meets the third criterion since there are ample alternative channels of

communication: Gerritsen could leaflet in other areas of the park or, presumably, he could use methods other than handbills to express his political views.

The more difficult question is whether the blue-line ban is narrowly tailored to achieve a significant government interest. The City advances three significant government interests behind the blue-line ban: (1) preserving the historic quality of the Olvera Street area; (2) maintaining a calm, secure environment for the Consulate and its visitors; (3) avoiding congestion in these often crowded areas. We concede that these interests are substantial, but we question the City's manner of achieving them. While the ban is narrow in its reach, in that it affects only these specific areas, courts rarely have upheld complete bans on a category of First Amendment expression.

In *Grace*, the Court noted that the government interests in protecting the Supreme Court Building and maintaining the decorum of the area were important, but questioned

> whether a total ban on carrying a flag, banner, or device on the public sidewalks substantially serves these purposes. There is no suggestion, for example, that appellees' activities in any way obstructed the sidewalks or access to the building, threatened injury to any person or property, or in any way interfered with the orderly administration of the building or other parts of the grounds. As we have said, the building's perimeter sidewalks are indistinguishable from other public sidewalks in the city that are normally open to the conduct that is at issue here and that § 13k forbids. A total ban on that conduct is no more necessary for the maintenance of peace and tranquility on the sidewalks surrounding the building than on any other sidewalks in the city. Accordingly, § 13k cannot be justified on this basis.

*Grace*, 461 U.S. at 182, 103 S.Ct. at 1709.

Similarly, in the case at bar, the blue-line areas are indistinguishable from other parts of the park. Nor is there evidence that Gerritsen's handbill distribution interfered with operation of these park areas. To the extent that City officials sought to curtail unprotected activity in the blue-line areas

(such as disruption of other legitimate park activities, the business of the Mexican Consulate, or visitors' enjoyment of the park), the *total* ban on handbill distribution is substantially broader than necessary. Moreover, City officials already had in place regulations to prevent these behaviors, as indicated by the occasions (some of which are described later in this opinion) when park officials did not hesitate to enforce laws aimed at Gerritsen's unprotected, disruptive conduct. Thus, a total ban on this activity in these areas is unjustified.

### C. *Constitutionality of the permit scheme*

█ Consistent with our analysis of the blue-line ban portion of the El Pueblo Park guidelines, in deciding whether the permit prong is constitutional, we must make three initial determinations: (1) whether or not the plaintiff's activities are protected speech or conduct, (2) whether the government restriction occurs in a public or non-public forum, and (3) whether or not the restriction is a valid time, place or manner regulation. We already have answered the first two questions—Gerritsen's activity is protected by the First Amendment and the park is a public forum.

Thus, in order to survive, the permit scheme must (1) be content-neutral, (2) be narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels of expression. *See Perry*, 460 U.S. at 45, 103 S.Ct. at 954; *Grace*, 461 U.S. at 177, 103 S.Ct. at 1706. The permit scheme is content-neutral in that it applies across the board to all types of handbills. While a person who is denied a permit to distribute handbills would be foreclosed from that method of communication, he or she would still have the option of engaging in other forms of expressive activity.

In determining whether a permit scheme is narrowly tailored to serve a significant government interest, we look to the "fit" between the state's regulation and the stated purposes in making this determination. *Cincinnati v. Discovery Network, Inc.,* ── U.S. ──, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (citing *Board of Trustees of State Univ. of*

*New York v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). Unfortunately, we are at a loss to discern any *significant* government interest in proposing the permit rule. The record reveals only one express reason. for the City's enacting the permit scheme—to make it more difficult for Gerritsen to distribute handbills regarding his political beliefs.

We hold that this purpose is not a significant government interest. Moreover, it is not a legitimate government interest—it is precisely the type of viewpoint censorship which the Constitution seeks to prevent. The Supreme Court and this court have made it clear that certain government interests are impermissible—the purpose of curtailing political speech which is controversial or anti-government is among these.[10] *See Boos*, 485 U.S. at 318, 108 S.Ct. at 1162 ("classically political speech" such as the anti-Soviet and anti-Nicaraguan speech plaintiffs here seek to express deserves special review); *Bay Area Peace Navy*, 914 F.2d at 1232 (Tang, J., concurring) ("courts must be particularly wary of how the government regulates those objecting to the government's speech").

Since we cannot discern a significant government interest behind the permit scheme, the City cannot show that it is narrowly tailored to meet such an interest. Thus, the permit prong of the El Pueblo Park guidelines fails the test for a valid time, place or manner restriction.

## V. THE BANNER REGULATION

■ Gerritsen claims that his First Amendment rights were violated by the City's regulation governing the hanging of message-bearing banners across city streets. As a threshold question, we must determine whether or not this regulation was applied to Gerritsen, since Gerritsen makes only an *as applied* challenge to the regulation. While one district court found that the regulation was applied, the other found that it was not, concluding that Gerritsen never made a valid application for a banner permit because he never submitted an insurance bond.

The record indicates that it was the City's practice to consider applications without the bond, with the understanding that, upon approval, the applicant would produce the bond before being allowed to hang the banner. Indeed, Gerritsen's cross-examination of Senior Street Use Inspector David Torrez revealed that almost all banners were hung by one of a few already-bonded companies with whom the applying party contracted. Often, the applying party would contract the company *after* gaining the City's approval for their message, as Gerritsen testified he intended to do. Torrez' and Gerritsen's testimony leads us to conclude that Gerritsen's failure to submit the bond does not invalidate his constitutional challenge. Thus, the district court erred in reaching its conclusion.

We find, however, that the banner regulation was not applied to Gerritsen for another reason, and, thus, that his constitutional claim is not properly before this court. The regulation restricts banners to those *announcing events* in the civic or public interest. Yet none of the applications Gerritsen submitted announced events of any sort. His proposed banners included the following: "Mexico—World Class Drug Pusher;" "City Hall Sucks;" and, "Merry Christmas, Happy New Year." Like all of the proposed banners for which Gerritsen sought permits, these messages express political beliefs or greetings, and so they do not fall within the guidelines for banners.

## VI. THE OTHER CLAIMS

■ Gerritsen raises several other claims on appeal, on which we affirm the district court. He challenges the constitutional validity of El Pueblo Park's requirements for use of its bandstand and sound system. The Park requires potential users to post a bond

---

10. We note that the impermissible government purpose here—to discourage Gerritsen from expressing his views in the park—comes close to destroying the permit scheme's content neutrality. Although the scheme is content neutral on its face, this purpose may convert it to a viewpoint-based regulation. *See Ward*, 491 U.S. at 791, 109 S.Ct. at 2753 ("Government regulation of expressive activity is content neutral so long as it is *'justified* without reference to the content of the regulated speech.'") (quoting *Clark*, 468 U.S. at 293, 104 S.Ct. at 3068).

for liability insurance to cover damage to the equipment or liability resulting from the unanticipated effects of such an event on park visitors. Gerritsen claims that the bond requirement was applied to him unfairly. This regulation infringes on protected speech in a public forum, so, in order to survive this court's review, it must be content-neutral, be narrowly tailored to meet a significant government interest, and leave ample alternatives for expression. *Ward,* 491 U.S. at 782–83, 109 S.Ct. at 2748–2749.

The bond requirement is content-neutral in that it is applied to every applicant regardless of the nature of the expression or content of the message they wish to convey. It furthers a significant government interest: the protection and maintenance of an expensive sound system. It is narrowly tailored to meet that goal by requiring most applicants to post the bond.[11] Finally, the bond requirement does not completely close off an applicant's opportunities for expressive activity; an applicant who cannot afford to or does not want to post the bond may conduct many other types of expressive activity in the park.

Gerritsen also challenges the City's policy to restrict use of the Barnsdall Gallery Theater to art and cultural presentations. The City-owned and operated theater is located in a public park, but use of the theater is administered through the Cultural Affairs Department. Gerritsen makes an as applied challenge to the ban on political events in the theater. After hearing testimony from the theater director and Gerritsen, the district court found that Gerritsen never made a complete application to use the theater. This finding is not clearly erroneous.

Gerritsen argues that City officials deprived him of his First Amendment rights by denying him access to the Triforium Stage. The Triforium is an outdoor amphitheater located in a public park; it is owned and operated by the City. The district court properly rejected Gerritsen's as applied challenge to the City's regulations for use of the stage because he did not file an application to use the stage. The record supports this finding: Gerritsen only inquired in the procedure for reserving the stage but actually never applied to use it.

Two of Gerritsen's claims on appeal concern the constitutionality of stops and detentions of him by the Los Angeles Police Department. On May 7, 1989, Gerritsen visited Lincoln Park to distribute handbills about his political beliefs. The park was filled with visitors gathered to celebrate "Cinco de Mayo," a Mexican holiday often celebrated in this country. The district court found that Gerritsen disrupted speakers at the event and caused a public nuisance generally. It also found that the police properly responded to the event's organizers' complaints about Gerritsen. Although Gerritsen's testimony conflicted with others on the scene that day, the district court's finding is not clearly erroneous.

On September 15, 1989, police detained Gerritsen after receiving complaints from private citizens and organizers of the El Grito Day celebration on the south lawn area near City Hall. The district court found that Gerritsen's conduct was not protected by the First Amendment and that the police were justified in detaining him. Although Gerritsen's testimony contradicted that of the defense witnesses, the trier of fact found their testimony more credible.

Gerritsen's final claim is a facial challenge to the City's prohibition of signs on city property with the exemption for real estate signs.[12] The City bans all signs on its property except for real estate signs. Government ownership of property alone does not convert it to a public forum. There is no evidence to suggest that the government has designated its property as a public forum. Thus, the regulation will be upheld if it is viewpoint neutral, narrowly drawn to serve a legitimate government purpose, and leaves

---

**11.** While it is true that the City exempts some users from the bond requirement, this does not upset the reasonableness of the fit between the purpose of protecting the equipment and requiring a bond.

**12.** Although the district court neglected to address this claim, in the interests of judicial economy, we reach the merits of it under a de novo review, as we would had the district court reached the question.

open other channels of communication. *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 815, 104 S.Ct. 2118, 2134, 80 L.Ed.2d 772 (1984). The regulation excludes all *noncommercial* signs, making it neutral as to political views. It serves a variety of legitimate government purposes, and there is no evidence to suggest that it is drawn any broader than necessary to do so. Finally, it leaves a myriad of other expressive opportunities to those wishing to express their noncommercial views. We find the City's sign ordinance constitutional.

## VII. CONCLUSION

In sum, we affirm the district court as to the bulk of Gerritsen's claims. As to the city's El Pueblo Park policies, we hold that these regulations violate the First Amendment. The blue-line ban is not narrowly tailored; the city failed to justify the need for a complete prohibition on handbill distribution in the blue-line areas. The permit scheme fails because the city's purpose in enacting the scheme—to discourage Gerritsen's protest activities in the park—was invalid. We remand these cases to the district court so that it may determine Gerritsen's damages against the City for violations of his constitutional rights.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

APPENDIX A: Guidelines for Solicitation of Donations and Distribution of Printed Matter at El Pueblo State Historic Park. Enacted August 11, 1983 by the Los Angeles Board of Recreation and Parks Commission and map.

FINDINGS IN SUPPORT OF GUIDELINES FOR SOLICITATION OF DONATIONS AND DISTRIBUTION OF PRINTED MATTER AT EL PUEBLO STATE HISTORIC PARK

1. Pursuant to the City of Los Angeles City Charter (hereinafter "Charter") section 171, the Department of Recreation and Parks (hereinafter "Department") has the obligation to shall maintain, operate and control all parks of the City of Los Angeles. El Pueblo State historic park is included within the jurisdiction of the Department by virtue of a joint powers agreement among the City of Los Angeles, County of Los Angeles and State of California, enacted by the City Council and signed by Mayor Tom Bradley on February 25, 1974, and pursuant to the authority of Government Code section 6500 *et seq.*

2. Pursuant to Charter, § 70, the Department is under the management and control of the Board of Recreation and Park Commissioners (hereinafter "Board").

3. The Board considers Olvera Street, Sanchez Street, the parking lots and the area immediately adjacent to the Mexican Consulate (see areas marked on Exhibit "1") to be vital to the promotion and accommodation of the historic and commemorative purposes of the facility known as El Pueblo State Historic Park. [Editor's note: Exhibit 1 omitted from publication by the court.]

4. El Pueblo State Historic Park currently accommodates approximately 2 million visitors a year who come to the facility because of its historic and commemorative importance relative to Mexican history in Los Angeles, because of the Mexican Consulate, and because of the Plaza Catholic Church.

5. It is the objective of the Board to keep Olvera Street, Sanchez Street, the parking lot and the area immediately adjacent to the Mexican Consulate as free as possible from congestion and obstructions as an aid to the visitors to the facility.

6. In recognition of its Charter duty to accommodate and promote public recreation and uses incidental thereto, the Board determines that due to historic significance of the facility, no portion of Olvera Street, Sanchez Street, the parking lots and the area immediately adjacent to the Mexican Consulate shall be utilized for a purpose not related to the promotion and accommodation of the historic landmark.

7. The Board finds that those who would seek to distribute or solicit donations will substantially contribute to the congestion at the foregoing sites and such activities are not compatible with the character and function of Olvera Street, Sanchez Street, the parking lots and the area immediately adjacent to the Mexican Consulate. Further, these sites are not a public forum.

8. In recognition of the fact that certain areas of the facility will accommodate solicitation of donations and distribution of literature, the Board adopts the attached guidelines.

## GUIDELINES FOR SOLICITATION OF DONATIONS AND DISTRIBUTION OF PRINTED MATTER AT EL PUEBLO STATE HISTORIC PARK

(a) The solicitation of donations or distribution of printed matter is permitted within park areas, provided a permit to do so has been issued by the Park Director.

(b) Any application for such a permit shall set forth the name of the applicant; the name of the organization, if any; the date, time, duration, and location of the proposed solicitation or distribution; and the number of participants.

(c) The Park Director shall issue a permit immediately on proper application unless:

(1) A prior applicant for a permit for the same time and location has been made and the activities authorized by that permit do not reasonably permit multiple occupancy of the particular area; or

(2) The sale or distribution will present a clear and present danger to the public health or safety; or

(3) The number of persons engaged in the sale or distribution exceeds the number that can reasonably be accommodated in the particular location applied for; or

(4) The location applied for has been designated as not available for the solicitation of donations or distribution of printed matter; or

(5) The activity would constitute a violation of any local, state or federal law.

If an applicant for a permit is denied, the applicant shall be so informed in writing, with the reason(s) for the denial clearly set forth.

(d) The Park Director shall designate on a map, which shall be available for inspection in the Office of the Park Director and is attached hereto as Exhibit 1, the locations within the park area that are not available for the solicitation of donations or distribution of printed matter. Locations may be designated as not available only if the area is not a public forum or if the solicitation of donations or distribution of printed matter would:

(1) Cause injury or damage to persons or to park resources; or

(2) Interfere with the areas maintained for historic or commemorative purposes and for which public access is prohibited or restricted to guided tours; or

(3) Unreasonably interfere with interpretive, living history, visitor services, or other program activities or with the administrative functions of El Pueblo state park.

(e) The permit may contain such conditions as are reasonably consistent with protection and use of the park area.

(f) No permit shall be issued for a period in excess of 14 consecutive days, provided that permits may be extended for like periods, upon a new application, unless another applicant has requested use of the same location and multiple occupancy of that location is not reasonably possible.

(g) Persons engaged in the solicitation of donations or distribution of printed matter under this section shall not obstruct or impede pedestrians or vehicles or those disembarking from vehicles, harass park visitors with physical contact or persistent demands, approach persons in line, misrepresent the purposes or affiliations of those engaged in the solicitation or distribution, or misrepresent whether the printed matter is available without cost or donation.

(h) The solicitation of donations or distribution of printed matter without a permit, or in violation of the terms or conditions of the permit, as listed in paragraph (c), or in violation of the terms and conditions of these guidelines, including paragraph (g), is prohibited.

(i) Any permit may be revoked under any condition listed in paragraph (h). Such a revocation shall be made in writing, with the reason(s) for revocation clearly set forth, except under emergency circumstances, when an immediate verbal revocation or suspension

may be made, to be followed by written confirmation.

(j) Upon revocation or denial of a permit, the applicant shall have the same opportunity for hearing as set forth in the demonstration guidelines (attached as Exhibit 2). [Editor's note: Exhibit 2 omitted from publication by the court.]