## BRENDEN P. LEYDON *v.* TOWN OF GREENWICH ET AL.
### (SC 16356)
### (SC 16357)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Dranginis, Js.

Argued March 15—officially released July 26, 2001*

* July 26, 2001, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Ralph G. Elliot,* for the appellants in Docket No. 16356 (named defendant et al.).

*Mark R. Kravitz,* with whom, on the brief, were *Suzanne E. Wachsstock* and *Dylan S. Calsyn,* for the appellant in Docket No. 16357 (Lucas Point Association, Inc.).

*Brenden P. Leydon,* pro se, the appellee in both cases (plaintiff).

*Toya Alek Graham, Philip D. Tegeler* and *Martin B. Margulies* filed a brief for the Connecticut Civil Liberties Union Foundation as amicus curiae.

*Russell L. Brenneman,* filed a brief for the commissioner of environmental protection as amicus curiae.

*Opinion*

PALMER, J. This certified appeal raises an important issue of first impression in this state, namely, whether a municipality constitutionally may restrict access to a municipal park to its residents and their guests. We conclude that such a restriction is prohibited by the first amendment to the United States constitution[1] and

---

[1] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

article first, §§ 4,[2] 5[3] and 14,[4] of the Connecticut constitution.

The plaintiff, Brenden P. Leydon, commenced this action against the named defendant, the town of Greenwich (town), seeking declaratory and injunctive relief to prohibit the enforcement of a town ordinance[5] limiting

[2] Article first, § 4, of the constitution of Connecticut provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

[3] Article first, § 5, of the constitution of Connecticut provides in relevant part: "No law shall ever be passed to curtail or restrain the liberty of speech . . . ."

[4] Article first, § 14, of the constitution of Connecticut provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

[5] The following provisions of the Greenwich municipal code are relevant to this appeal.

Section 7-30 provides in relevant part: "In accordance with No. 124 of the Special Acts of 1919, as amended, and recognizing that public parks . . . have been acquired . . . for the use of the inhabitants of the Town . . . only inhabitants of the Town may enter, remain upon or use [the town's] parks . . . ."

Section 7-36 provides: "Pursuant to the Charter of the Town and recognizing that public beaches, recreation places and facilities have been acquired and constructed by the Town [using] its own funds for the use of the inhabitants of the Town and are operated and maintained by the Town using its funds for the use of its inhabitants, and further recognizing that said beaches, recreation places and facilities have a limited capacity and are insufficient to accommodate all persons and to avoid excessive congestion, prevent breakdown, collapse and deterioration of said facilities and places, to protect the environment and prevent further ecological destruction, to encourage the acquisition of additional beaches, recreation places and facilities by the Town and to promote health, comfort, convenience and welfare, only inhabitants of the Town may enter, remain upon or use public beaches, recreation places and facilities except for guests of inhabitants of the Town pursuant to this ordinance and other applicable laws, ordinances and regulations promulgated by the Director [of Parks and Recreation]."

Section 7-37 provides: "Beach passes may be obtained by inhabitants of the Town from the Director [of Parks and Recreation] pursuant to regulations and fees prescribed by him."

Section 7-38 provides: "No person shall enter upon or be permitted on any beach without a duly issued beach pass except as herein provided."

access to Greenwich Point Park (Greenwich Point), a town park with a beachfront on the Long Island Sound, to residents of the town and their guests.[6] Thereafter, the defendant Lucas Point Association, Inc. (association), which owns a road located on property adjacent to Greenwich Point over which the town holds an easement providing the only means of land access to Greenwich Point, successfully moved to intervene. Following a court trial, the court rejected the plaintiff's claims and rendered judgment for the defendants.[7] On appeal, the Appellate Court reversed the judgment of the trial court, concluding that the ordinance violates a state common-law doctrine pursuant to which municipal parks are deemed to be held in trust for the benefit of the general public and not solely for the use of residents of the municipality. *Leydon* v. *Greenwich*, 57 Conn. App. 712, 719, 750 A.2d 1122 (2000). The Appellate Court remanded the case to the trial court with direction to render judgment for the plaintiff; id., 727; who, as we have indicated, sought injunctive and declaratory relief against both the town and the association. Thereafter,

Section 7-39 provides in relevant part: "[E]ach family of inhabitants . . . may obtain admittance of not more than eight . . . guests on any one day to any Town owned beach or recreational place, provided such guests are actually visiting with said family's residence and an inhabitant . . . accompan[ies] said guests and remains with them at the facility. . . ."

Section 7-56 provides in relevant part: "A. Any person violating any of the provisions of [the] ordinance shall be subject to a fine not to exceed twenty-five ($25.00) for each offense. . . .

"C. Any person obtaining a beach pass . . . or the admission of a guest by the making of a false statement under oath shall have any and all rights or privileges to (1) Use the parks or beaches . . . suspended for a period of one year. . . ."

For ease of reference, we refer to these sections of the Greenwich municipal code, collectively, as the ordinance.

[6] We note that the town also issues beach passes to nonresident town employees who have been granted the right to obtain such passes under a collective bargaining agreement with the town.

[7] In addition to the town, the town's board of selectmen and John Margenot, the town's first selectman at all relevant times, were named as defendants.

we granted the town's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the plaintiff was entitled as a matter of law to an injunction enjoining the [town] from limiting the use of Greenwich Point, including its beach area, to inhabitants of the town?" *Leydon* v. *Greenwich*, 254 Conn. 904, 755 A.2d 881 (2000). We also granted the association's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude, in effect, that the plaintiff was entitled as a matter of law to an injunction enjoining the [association] from limiting the use of the easement that it had granted to the . . . town . . . to residents of the town?" *Leydon* v. *Greenwich*, 254 Conn. 905, 755 A.2d 882 (2000).

With respect to the town's appeal, we agree with the Appellate Court that the plaintiff is entitled to declaratory and injunctive relief barring the town from restricting the use of Greenwich Point to town residents and their guests. Our conclusion, however, rests not on common-law principles, but, rather, on the federal and state constitutional guarantees of freedom of expression and freedom of association. With respect to the association's appeal, we agree with the Appellate Court that the plaintiff is entitled to a declaratory judgment against the association. We disagree with the Appellate Court, however, that the plaintiff also is entitled to injunctive relief against the association.

I

The following facts and procedural history are relevant to our resolution of this case. Greenwich Point is a town owned, 147 acre park facility that includes a beachfront on the Long Island Sound. The park area contains a number of ponds, a marina, a parking lot, open fields, a nature preserve, shelters, walkways and

trails, and picnic areas with picnic tables. There also is a library book drop located on the beach.

The only land access to Greenwich Point is over a narrow, broccoli stem shaped piece of land known as Tod's Driftway (driftway), which is owned by the association, a private association of landowners who reside in the residential area adjacent to Greenwich Point. The town holds an easement over a private road on the driftway that provides the only means by which a person seeking to enter Greenwich Point by land may do so.

The Greenwich Point area, the driftway and the surrounding area all originally were owned by Frelinghuysen Ferris. Ferris conveyed the Greenwich Point area to J. Kennedy Tod on March 30, 1892. Ferris later granted an easement over the driftway to Tod on October 17, 1892, while retaining title to the driftway and other land. The easement permitted Tod to construct a road over the driftway connecting Greenwich Point to the mainland highway and to use that road to access his property.

Soon after Ferris granted the easement to Tod, Ferris transferred the driftway and surrounding areas in fee simple to Edwin J. Lucas. Those two areas became known as Lucas Point. After Tod's completion of the road over the driftway around 1909, Tod and Lucas amended and reaffirmed the terms of Tod's easement over the driftway. The boundaries of both properties, as set forth in a 1915 survey that listed the Greenwich Point parcel at approximately 147.21 acres, were the same as the boundaries currently in place.

Tod maintained Greenwich Point as a residence until his death on July 16, 1926, upon which he devised it to the Columbia Presbyterian Hospital (hospital), subject to a possessory life estate in Tod's wife. Tod's wife died in 1938, at which time the hospital became the fee owner of Greenwich Point.

During the 1920s and 1930s, Lucas developed Lucas Point into a residential area. In 1942, the homeowners on Lucas Point formed and incorporated the association. On June 20, 1950, after Lucas' death, his executor recorded the transfer of all rights in the driftway to the association, although it appears that the association had been the beneficial owner of the driftway since the association's formation in 1942.

In 1944, the association became aware of the town's decision to purchase Greenwich Point from the hospital for the purpose of converting it into a beach park.[8] At its meeting of October 1, 1944, the association passed a resolution providing, inter alia, that it was "not opposed to the purchase of [Tod's] Point by the [t]own . . . subject, however, to the following [condition] . . . [that the town] [l]imit the use of the area to Greenwich residents." At a town meeting on November 9, 1944, the town approved a policy restricting the use of Tod's Point to "residents, taxpayers, lessees and their bona fide guests of the [t]own . . . ." Minutes of the meetings of the town's board of selectmen and the board of estimate and taxation also reflect the adoption of this policy. The town purchased Greenwich Point on January 10, 1945, but did not codify the residency requirement until 1977, when it adopted the ordinance that is the subject of this appeal and that restricts access to Greenwich Point to town residents and their guests. See footnote 5 of this opinion.

[8] The town's authority to maintain Greenwich Point as a park is derived from 18 Spec. Acts 103, No. 124 (1919), as amended by 27 Spec. Acts 56, 60, No. 71, § 9 (1955). The relevant enabling language, which was not affected by the 1955 amendment, provides: "The town of Greenwich may establish, maintain and conduct public parks, playgrounds, bathing beaches and recreation places, together with such means of transportation thereto as may be necessary or desirable, and may acquire by purchase or lease or otherwise, land and property necessary thereto, and may equip said parks, playgrounds, bathing beaches and recreation places with all necessary buildings and equipment for the use of the inhabitants of said town." 18 Spec. Acts 103, No. 124 (1919).

On August 15, 1994, after crossing the driftway without interference from the town or the association, the plaintiff, a resident of Stamford, attempted to enter Greenwich Point at its main gate. He was refused admission, however, because he did not have a beach pass as required by the ordinance.[9] Thereafter, the plaintiff applied for a beach pass, but his application was denied in accordance with the provision of the ordinance authorizing the issuance of beach passes to town residents only.

The plaintiff then filed this action for declaratory and injunctive relief against the town, claiming, inter alia, that the ordinance violates: (1) the first amendment to the United States constitution and article first, §§ 4, 5 and 14,[10] of the Connecticut constitution, both as applied to him and on its face; and (2) a state common-law doctrine under which municipal parks are held in trust by the municipality for the use of all members of the public.[11] The association successfully moved to

[9] It appears that the association itself has never sought to enforce a residents only policy over its private roadway leading to Greenwich Point. Rather, nonresidents seeking admission to Greenwich Point are turned away by an agent of the town at the park's entrance upon their failure to display a permit that, under the ordinance, may be obtained only by town residents.

[10] We note that the complaint itself contains no express reference to article first, § 14, of the state constitution. The complaint alleges, however, that the "[p]laintiff's attempt to enter upon the [p]ark was for purposes of expressing himself by exchanging ideas and information with other park users on topics of social and political importance." Moreover, the cases upon which the plaintiff relies in support of his state constitutional claim were decided under article first, §§ 4, 5 and 14. See, e.g., Ramos v. Vernon, 254 Conn. 799, 811, 761 A.2d 705 (2000); State v. Linares, 232 Conn. 345, 380, 655 A.2d 737 (1995). Finally, one of the amici curiae, the Connecticut Civil Liberties Union Foundation, expressly raised article first, § 14, in support of the plaintiff's state constitutional claim without objection from the defendants. We, therefore, treat the plaintiff's state constitutional claim as embodying article first, § 14, as well as article first, §§ 4 and 5, of the state constitution.

[11] The plaintiff also raised several other constitutional, statutory and common-law claims. We need not address those claims, however, in light of our conclusion that the plaintiff is entitled to prevail under the freedom of expression and association provisions of the federal and state constitutions.

intervene, and the plaintiff amended his complaint to include a count against the association. In that count, the plaintiff claimed that any agreement that the association purported to have with the town to restrict the use of Greenwich Point to town residents and their guests was unenforceable as against public policy. The plaintiff also sought injunctive relief against the association.[12]

After a court trial, the court rejected each of the plaintiff's claims. The court first addressed the plaintiff's constitutional claim. With respect to the plaintiff's contention that the ordinance is unconstitutional as applied, the trial court concluded that the plaintiff's intended use of Greenwich Point, namely, to " 'exchang[e] ideas and information with other park users,' " did not implicate his protected right to communicate. The trial court concluded that it was "not persuaded that the plaintiff's conduct touches upon [constitutionally protected] elements of communication. Simply stated, the plaintiff has failed to provide the court with evidence which would establish that he intended to enter [Greenwich] Point in order to express himself in any manner, regardless of whether the communication would be protected by the state and federal constitutions . . . ." (Internal quotation marks omitted.)

The trial court explicated its reasoning in rejecting the plaintiff's claim as follows: "The plaintiff implicates the first amendment (and its state counterparts) by

[12] The plaintiff's substantive claim against the association, is primarily for a declaratory judgment providing that the association is not entitled to enforcement of the residents only requirement under the association's claimed 1945 agreement with the town. In addition, however, the plaintiff sought, inter alia, an injunction "enjoining *the [d]efendants*, their officers, agents, employees, successors, and all persons in active concert or participation with them from limiting [the] [p]laintiff's entry and access to [the town's] beach parks on the basis of place of residency." (Emphasis added.)

asserting that he was prevented from exchanging ideas and information with other park users. However, the plaintiff has not provided the court with sufficient evidence which proves that the [ordinance] prevented him, or anyone from exchanging ideas with anyone else.

"The plaintiff has shown only that he was denied access to Greenwich Point . . . by a town employee stationed at the gate . . . because he did not have a beach pass and was not accompanied by a [town] resident. The court is convinced that the town's subsequent denial of a pass to the plaintiff had absolutely nothing to do with the plaintiff's desire to engage in expression. Rather, the town denied him a pass because it has an ordinance limiting its granting of passes to [town] residents.

"The court finds that the town does not have an ordinance, as the plaintiff would have the court believe, preventing nonresidents from accessing [Greenwich] Point. The town's [ordinance] require[s] only that a nonresident desiring entry to [Greenwich] Point be accompanied by a [town] resident. Therefore, if the plaintiff truly intended to express himself on [Greenwich] Point, he would have been able to do so, unimpeded, if he were accompanied by a [town] resident." (Internal quotation marks omitted.) The court continued: "In the present case, the court is not convinced that the plaintiff ever intended to enter [Greenwich] Point in order to engage in the expression of an idea. And, if he had, the court is not persuaded that the subject [ordinance] prevented the plaintiff, or any nonresident, from accessing [Greenwich] Point for purposes of protected expression."[13]

---

[13] There is nothing in the record to refute the plaintiff's wholly unremarkable assertion that, upon his admission to Greenwich Point, he intended to express himself by conversing with others "on topics of social and political importance." Indeed, the record fully supports the plaintiff's assertion. For example, the plaintiff testified, without contradiction, that, if permitted to enter Greenwich Point, he intended to use the park both for recreational activities *and* to discuss issues of importance to him and to the public,

Finally, the trial court, consistent with its analysis of the plaintiff's claim that the ordinance is unconstitutional as applied, summarily rejected the plaintiff's over-

including the use of beach property by members of the general public. The plaintiff also testified that, on one occasion when he sought and was denied admission to Greenwich Point, he was to be interviewed, on the beach, by a reporter from the New York Times, regarding the issue of public access to parks. Furthermore, the record is devoid of any evidence that might cast doubt on the plaintiff's testimony regarding his reasons for seeking admission to Greenwich Point. We, therefore, are unwilling to read the trial court's memorandum of decision as rejecting the plaintiff's unrebutted assertion. Rather, we interpret the court's memorandum of decision as concluding that the discussions in which the plaintiff intended to engage, in the setting described, simply would not implicate any constitutionally protected rights. That conclusion is insupportable, however, because, at a minimum, the free speech provisions of the federal and state constitutions encompass the right to engage in conversations of the kind contemplated by the plaintiff. In any event, there can be no doubt that the plaintiff sought admission to Greenwich Point to exercise his constitutional right to freedom of association, which, alone, is sufficient to implicate the protections of the federal and state constitutions.

If, contrary to our interpretation of the trial court's findings, the court indeed purported to discredit the plaintiff's testimony regarding the nature of the expressive activities in which he intended to engage at Greenwich Point, we have grave reservations as to whether that conclusion is supportable. Although a trial court's factual findings will be overturned only if they are clearly erroneous; e.g., *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 345, 736 A.2d 824 (1999); a factual determination will not be upheld on appeal, even though it might be supportable by some evidence, if "the reviewing court is left with the definite and firm conviction that a mistake has been made." Id., 346. In this case, there simply is no reason to doubt the plaintiff's essentially unchallenged testimony that, if admitted to Greenwich Point, he would participate in, among other things, discussions with others at the park regarding matters of public concern, including the very issue of public access to public property that is the subject of this appeal. Moreover, because the plaintiff's claims, supported by his unrebutted testimony, raise important first amendment issues, we are obliged to conduct a careful and "independent examination of the whole record . . . so as to assure ourselves that [the trial court's determination] does not constitute a forbidden intrusion on the field of free expression." (Internal quotation marks omitted.) *Hurley* v. *Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 567–68, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995). Thus, if we were to construe the trial court's factual findings as rejecting the plaintiff's testimony in regard to his intention of engaging in protected, expressive conduct at Greenwich Point, we likely would be compelled to find that determination clearly erroneous.

breadth claim. Specifically, the court stated: "The challenged [ordinance has] . . . no . . . effect on the first amendment protections *of any party*." (Emphasis added.)

The trial court next addressed, and rejected, the plaintiff's claim that, under state common law, all members of the public are entitled to use municipally owned and operated parks. Although the trial court recognized that dicta from several of this court's cases suggest that town parks are held in trust for the benefit of all members of the public and not just for the benefit of town residents,[14] the court nevertheless concluded that the plaintiff had failed to establish the existence of such a common-law doctrine.[15] Accordingly, the trial court rendered judgment for the defendants.

---

[14] In particular, the trial court considered *Stradmore Development Corp.* v. *Commissioners, Board of Public Works of New Britain*, 164 Conn. 548, 324 A.2d 919 (1973), in which this court, in dictum, stated that "lands held by a town *as a park are held not for its own benefit or that of its inhabitants* but for the benefit of the people of the state at large." Id., 551.

[15] At this point, it is useful to explain more fully the specific claims of the association and the trial court's response to them. At trial, counsel for the association asserted that the association had "joined this lawsuit in order to ensure that the present beach policy in the town . . . is maintained. That is the only way that legally enforceable rights of the association can be protected." This statement accurately summarizes the position of the association in the trial court in defense of the plaintiff's claim: the association asserted that *the association itself* was entitled to have the ordinance's residents only requirement enforced pursuant to its 1945 agreement with the town.

The association advanced four reasons, in addition to those advanced by the town, why the trial court should reject the plaintiff's claim that enforcement of the residents only policy must be enjoined. Specifically, the association asserted that, if nonresidents are allowed access to Greenwich Point: (1) the easement over the association's property will be overburdened; (2) the safety of the association's members and persons who use the beach will be endangered; and (3) the ecology of the area will be harmed. The association characterized its fourth argument as one of promissory estoppel, asserting that the town should be estopped from changing its residents only policy in light of the fact that the association, which relied on the town's promise to adopt such a policy, did not seek to block the town's purchase of the Greenwich Point property.

In light of its conclusion upholding the validity of the ordinance, the trial

Thereafter, the plaintiff appealed from the trial court's judgment to the Appellate Court, which concluded that, contrary to the determination of the trial court, the plaintiff had established his common-law claim. In so concluding, the Appellate Court stated: "For almost two centuries, [the Connecticut] Supreme Court has discussed the concept that land held by a municipality as a public park or public beach is held for the use of the general public and not solely for use by residents of the municipality.[16] . . . These [Supreme

court acknowledged that it was not required to address any of the arguments raised by the association, which, as we have indicated, sought only to have the ordinance enforced. The trial court nevertheless stated that it was "aware of the sensitive nature of this case and [was] compelled to briefly make factual findings in response to [the association's] main arguments." The court thereupon: (1) rejected the association's contention regarding overburdening; and (2) agreed with the association that "opening the beach to nonresidents would have a significant negative effect on the environmental aspects of [Greenwich] Point . . . [and] on the surrounding property, which is owned by [association] members." The court stated, however, that "[t]his finding . . . has not impacted the court's ultimate decision. Whether this type of environmental concern can override certain constitutional rights is an issue saved for another day." Finally, the trial court also stated that the association "has proved to the court that the easement granted to the town was done . . . with the intention that only [town] residents (and their guests) use the easement. The court need not, however, reach the issue of the effect of this intention on the plaintiff's [claim]." Inasmuch as these statements and findings are not necessary to the trial court's judgment, they are dicta. See, e.g., *Dowling* v. *Finley Associates, Inc.*, 248 Conn. 364, 374, 727 A.2d 1245 (1999) ("[f]indings on nonessential issues usually have the characteristics of dicta" [internal quotation marks omitted]).

Nevertheless, on appeal, the association contends that the trial court's finding that the easement over its property was granted to the town "with the intention that only [town] residents (and their guests) use the easement" establishes that only town residents may use the easement to gain access to Greenwich Point. As we explain in part IV of this opinion, that contention is without merit because, contrary to the trial court's finding, no such easement was created in 1945.

[16] The Appellate Court cited a number of cases in which this court, in dicta, had suggested as much. E.g., *Stradmore Development Corp.* v. *Commissioners, Board of Public Works of New Britain*, 164 Conn. 548, 551, 324 A.2d 919 (1973); *Torrington* v. *Coles*, 155 Conn. 199, 201, 230 A.2d 550 (1967); *Fenwick* v. *Old Saybrook*, 133 Conn. 22, 29–30, 47 A.2d 849 (1946); *Conners* v. *New Haven*, 101 Conn. 191, 194, 125 A. 375 (1924); *Dawson* v. *Orange*,

Court] cases clearly reflect that land held by a municipality as a public park or public beach is for the benefit of all residents of this state."[17] (Citations omitted.) *Leydon* v. *Greenwich*, supra, 57 Conn. App. 718–19.

The town claimed that, even if the Appellate Court properly had recognized this common-law doctrine,[18] the legislature had abrogated the doctrine with respect to the town by virtue of a 1919 special act[19] authorizing

---

78 Conn. 96, 119, 61 A. 101 (1905); *Hartford* v. *Maslen*, 76 Conn. 599, 611, 57 A. 740 (1904); *Merwin* v. *Wheeler*, 41 Conn. 14, 24 (1874); *Hayden* v. *Noyes*, 5 Conn. 391, 397 (1824); see *Leydon* v. *Greenwich*, supra, 57 Conn. App. 718–19.

[17] The Appellate Court characterized this doctrine as the "public trust" doctrine. As one of the amici curiae, the commissioner of environmental protection, notes, however, that term traditionally has been used to refer to the body of common law under which the state holds in trust for public use title in waters and submerged lands waterward of the mean high tide line. See, e.g., *Phillips Petroleum Co.* v. *Mississippi*, 484 U.S. 469, 476, 108 S. Ct. 791, 98 L. Ed. 2d 877 (1988); *Mihalezo* v. *Woodmont*, 175 Conn. 535, 538, 400 A.2d 270 (1978); *Brower* v. *Wakeman*, 88 Conn. 8, 11, 89 A. 913 (1914); *Simons* v. *French*, 25 Conn. 345, 351 (1856). Under the public trust doctrine, members of the public have the right to access the portion of any beach extending from the mean high tide line to the water, although it does not also give a member of the public the right to gain access to that portion of the beach by crossing the beach landward of the mean high tide line. See, e.g., *Delinks* v. *McGowan*, 148 Conn. 614, 620, 173 A.2d 438 (1961); cf. *Walz* v. *Bennett*, 95 Conn. 537, 542, 111 A. 834 (1920). Thus, the public trust doctrine does not support the plaintiff's claim concerning his right of access to Greenwich Point because the plaintiff would not be permitted to gain unrestricted access to Greenwich Point under that doctrine; he would not be permitted to gain access by way of the driftway, and his access would, in any event, be limited to that part of the beach waterward of the mean high tide line.

Contrary to the suggestion of the Appellate Court; see *Leydon* v. *Greenwich*, supra, 57 Conn. 719 n.9; this public trust doctrine, which is a well established part of our common law and which applies both to privately and publicly owned shorefront property, is entirely separate and distinct from the doctrine advanced by the plaintiff in this case regarding the use of public parks generally. It, therefore, was inappropriate for the Appellate Court to conflate the two doctrines by referring to them as one and the same.

[18] The town maintained in the Appellate Court, as it had argued in the trial court, that no such common-law doctrine has been recognized in this state.

[19] See footnote 8 of this opinion.

the town to "establish, maintain and conduct public parks . . . [and] bathing beaches . . . *for the use of the inhabitants of [the] town.*" (Emphasis added.) 18 Spec. Acts 103, No. 124 (1919). In particular, the town asserted that the use of the words "for the use of the inhabitants of said town"; id.; evinced an intent by the legislature to permit the town to maintain its parks and beaches for the *exclusive* use of its residents. The Appellate Court rejected the town's argument, concluding that, because the special act was devoid of express language abolishing the common-law doctrine vis-a-vis the town, it could not be presumed that the legislature intended such a result. *Leydon* v. *Greenwich,* supra, 57 Conn. App. 724. The Appellate Court thereupon reversed the judgment of the trial court and remanded the case "with direction to render judgment for the plaintiff." Id., 727.

On appeal to this court, the defendants contend that the Appellate Court improperly reversed the trial court's judgment. We disagree with the defendants. Unlike the Appellate Court, however, we base our conclusion on the protections afforded under the first amendment to the federal constitution and article first, §§ 4, 5 and 14, of the state constitution.[20] We, therefore, conclude that

[20] Because we resolve this appeal on constitutional grounds, we need not decide whether the Appellate Court properly recognized the existence of a common-law doctrine under which town parks purportedly are held by the town for use by the public at large, and not just for use by the town's residents. Although we normally would consider the plaintiff's common-law claim before reaching his constitutional claim in order to avoid unnecessary constitutional adjudication; see, e.g., *Packer* v. *Board of Education,* 246 Conn. 89, 98, 717 A.2d 117 (1998); we depart from that policy in this case for several reasons.

First, we are persuaded that the plaintiff's constitutional claim is plainly meritorious, whereas the common-law doctrine upon which the Appellate Court relied never before has provided the basis for a holding of a court of this state. Second, that common-law doctrine, if it exists, would be subject to legislative abrogation, whereas the constitutional principles advanced by the plaintiff are not. Cf. *Boerne* v. *Flores,* 521 U.S. 507, 536, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997) ("When the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the

the plaintiff is entitled to: (1) a judgment against the town declaring that the ordinance is unenforceable; (2) a judgment against the association declaring that any agreement that it had entered into with the town in 1945 to limit access to Greenwich Point to town residents and their guests is unenforceable; and (3) a permanent injunction against the town, but not against the association, prohibiting the town from enforcing the ordinance. We also conclude that, to the extent that the Appellate Court's judgment required the trial court to issue an injunction against the association precluding it from limiting access over the driftway, that judgment must be reversed.

## II

We first examine the plaintiff's claim under the first amendment to the federal constitution. He contends

duty to say what the law is. *Marbury* v. *Madison*, [5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803)]. When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including stare decisis, and contrary expectations must be disappointed."). Furthermore, if there is such a common-law doctrine, it is questionable whether it exists separate and apart from what has evolved into the public forum doctrine; see part II of this opinion; that the United States Supreme Court has adopted for purposes of first amendment analysis. See, e.g., *Frisby* v. *Schultz*, 487 U.S. 474, 480–81, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988) ("[i]n decisions [of the United States Supreme Court] identifying public streets and sidewalks as traditional public fora [the use of which for communicative activity may not be curtailed in the absence of a compelling state interest and a narrowly tailored regulation to achieve that end] are not accidental invocations of a cliche, but recognition that [w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public" [internal quotation marks omitted]). Finally, any such common-law doctrine likely would be subsumed by free speech and association rights that are protected under the federal and state constitutions.

In the particular circumstances of this case, therefore, we do not feel compelled to address the plaintiff's common-law claim before considering his constitutional claim.

that the ordinance violates the first amendment as applied and on its face. We agree.

Before reviewing the substantive first amendment principles governing our review of the plaintiff's federal constitutional claim, we briefly explain the overbreadth doctrine. "A clear and precise enactment may . . . be overbroad if in its reach it prohibits constitutionally protected conduct. . . . A single impermissible application of a statute, however, will not be sufficient to invalidate the statute on its face; rather, to be invalid, a statute must reach a substantial amount of constitutionally protected conduct. . . . A [plaintiff] may challenge a statute as facially overbroad under the first amendment, even if the [plaintiff's] conduct falls within the permissible scope of the statute, to vindicate two substantial interests: (1) eliminating the statute's chilling effect on others who fear to engage in the expression that the statute unconstitutionally prohibits; and (2) acknowledging that every [person] has the right not to be prosecuted for expression under a constitutionally overbroad statute."[21] (Citations omitted; internal quotation marks omitted.) *State* v. *Linares*, 232 Conn. 345, 364–65, 655 A.2d 737 (1995); see also *Ramos* v. *Vernon*, 254 Conn. 799, 811, 761 A.2d 705 (2000) ("[this court has] not hesitated to consider facial challenges premised upon free speech claims"). Thus, the plaintiff has standing to raise a facial overbreadth challenge to the ordinance and may prevail on that claim if he can establish that the ordinance reaches a substantial amount of constitutionally protected conduct even though he personally did not engage in such conduct. See *State* v. *Linares*, supra, 364. We now turn to the applicable first amendment law.

---

[21] Although this is not a criminal case, the second justification nevertheless is relevant because any nonresident who enters Greenwich Point unaccompanied by a town resident presumably would be subject to prosecution for criminal trespass in the third degree under General Statutes § 53a-109.

The scope of the government's power to limit speech or other first amendment activity on public property depends on the type of forum involved. See, e.g., *Arkansas Educational Television Commission* v. *Forbes*, 523 U.S. 666, 677–78, 118 S. Ct. 1633, 140 L. Ed. 2d 875 (1998); *Perry Educational Assn.* v. *Perry Local Educators' Assn.*, 460 U.S. 37, 44–46, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983). "When a regulation restricts the use of government property as a forum for expression,[22] an initial step in analyzing whether the regulation is unconstitutional is determining the nature of the government property involved. . . . The nature of the property determines the level of constitutional scrutiny applied to the restrictions on expression. . . . The [United States] Supreme Court has delineated three categories of government-owned property for purposes of the First Amendment: the traditional public forum, the designated public forum, and the nonpublic forum." (Citations omitted.) *United States* v. *Frandsen*, 212 F.3d

[22] Of course, "[i]t is a necessary predicate to free speech analysis that the government's action has, in some way, implicated the free exercise of speech. . . . In other words, if the statute regulates conduct only, i.e., conduct which has no arguable expressive component, then such regulation does not impermissibly curtail freedom of speech. . . . Free speech scrutiny, in order to protect expression adequately, must be triggered by a threshold finding that particular government regulation has the *incidental effect of burdening expression*." (Citation omitted; emphasis added; internal quotation marks omitted.) *Ramos* v. *Vernon,* supra, 254 Conn. 813. As we previously indicated, the trial court had concluded that the ordinance does not implicate expressive and associational values. We disagree. The ordinance bars all nonresidents who are unaccompanied by a town resident from Greenwich Point, a public beach park. Thus, any nonresident who is unable to find a town resident to accompany him or her to Greenwich Point cannot engage in *any* activity there, *including* expressive and associational activity. Moreover, it is reasonable to presume that, for many reasons, most nonresidents who might wish to gain admission to Greenwich Point will be unable to find a town resident willing to serve as a host. Even if a nonresident can find a town resident to accompany him or her to Greenwich Point, the mere fact that he or she is required to do so places more than an incidental burden on the nonresident's expressive and associational rights. It, therefore, is inarguable that the ordinance significantly limits the ability of nonresidents to engage in constitutionally protected activities at Greenwich Point.

1231, 1237 (11th Cir. 2000); cf. *Perry Educational Assn.* v. *Perry Local Educators' Assn.*, supra, 45–46.

In *State* v. *Linares*, supra, 232 Conn. 345, this court recently summarized the basic principles of the traditional public forum doctrine: "[T]he first amendment in all contexts forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others. *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U.S. 789, 804 [104 S. Ct. 2118, 80 L. Ed. 2d 772] (1984). . . . Viewpoint neutral regulations, however, can be determined to be unconstitutional only after they have been analyzed under a forum based approach. *Perry Educational Assn.* v. *Perry Local Educators' Assn.*, [supra, 460 U.S. 45–46].

"In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. . . . [Such locations include] streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. *Hague* v. *CIO*, 307 U.S. 496, 515 [59 S. Ct. 954, 83 L. Ed. 1423] (1939). In these quintessential public forums, the government may . . . enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. [*Perry Educational Assn.* v. *Perry Local Educators' Assn.*], supra, 460 U.S. 45. Such close scrutiny is appropriate in these forums because such properties possess long-standing traditions of public usage."[23] (Citations omitted; internal

---

[23] We note that, as a general matter, under the forum-based approach adopted by the United States Supreme Court, courts do not conduct a particularized inquiry into the manner in which the specific public property at issue historically has been used. The inquiry, rather, is whether, in light of the objective characteristics of that property, it is a street, sidewalk or park in the traditional or conventional sense of those terms. If so, the

quotation marks omitted.) *State* v. *Linares*, supra, 232 Conn. 366–67. Thus, "[t]he forum-based approach for First Amendment analysis subjects to the highest scrutiny the regulation of speech on government property traditionally available for public expression." *Loper* v. *New York City Police Dept.*, 999 F.2d 699, 703 (2d Cir. 1993), citing *International Society for Krishna Consciousness, Inc.* v. *Lee*, 505 U.S. 672, 678, 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992); see also *Grayned* v. *Rockford*, 408 U.S. 104, 115, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) ("[t]he right to use a public place for expressive activity may be restricted only for weighty reasons"). See generally *International Society for Krishna Consciousness, Inc.* v. *Lee*, supra, 696 (Kennedy, J., concurring in the judgments) ("The liberties protected by [the public forum] doctrine derive from the Assembly, as well as the Speech and Press Clauses of the First Amendment, and are essential to a functioning democracy. . . . Public places are of necessity the locus for discussion of public issues, as well as protest

---

property is a public forum for purposes of first amendment analysis. See *Burson* v. *Freeman*, 504 U.S. 191, 196, 112 S. Ct. 1846, 1850, 119 L. Ed. 2d 5 (1992) ("[quintessential public] forums include those places which by long tradition or by government fiat have been devoted to assembly and debate, such as parks, streets, and sidewalks" [internal quotation marks omitted]); *Frisby* v. *Schultz*, 487 U.S. 474, 481, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988) ("[n]o *particularized inquiry* into the precise nature of a specific street [sidewalk or park] is necessary; all public streets [sidewalks and parks] are held in the public trust and are properly considered traditional public fora" [emphasis added]); *United States* v. *Grace*, 461 U.S. 171, 177, 103 S. Ct. 1702, 75 L. Ed. 2d 736 (1983) ("public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, *without more*, to be public forums" [emphasis added; internal quotation marks omitted]). But see *United States* v. *Kokinda*, 497 U.S. 720, 727–28, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990) (distinguishing postal service sidewalk from municipal sidewalks and concluding that postal service sidewalk is not traditional public forum after conducting review of nature and history of sidewalk at issue); *Greer* v. *Spock*, 424 U.S. 828, 836–38, 96 S. Ct. 1211, 47 L. Ed. 2d 505 (1976) (holding that streets and sidewalks inside Fort Dix military reservation, were not traditional public fora).

against arbitrary government action." [Citation omitted.]).

Thus, it "is clear that modern public forum analysis under the United States constitution focuses first on the category of public property at issue in the case. . . . Only after a court has labeled a particular public property as a traditional, designated or nonpublic forum does the court then consider to what extent the government may restrict speech there. . . . Because restrictions on speech in public forums receive the highest level of scrutiny and those in nonpublic forums are subject to the lowest . . . a court's initial categorization of property, as a practical matter, necessarily determines whether a particular restriction on speech will be invalidated."[24] (Citations omitted.) *State* v. *Linares,* supra, 232 Conn. 369; see also *Cornelius* v. *NAACP Legal Defense & Educational Fund,* 473 U.S. 788, 797, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985) ("[the court] must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic").

Upon application of these principles, we conclude that Greenwich Point is a traditional public forum because it has the characteristics of a public park. Indeed, our research indicates that each of the several federal courts that has considered the question of whether a beach park like Greenwich Point is a traditional public forum has found that it is.[25] For example,

---

[24] The trial court did not engage in a forum-based analysis, presumably because it concluded, incorrectly, that the ordinance does not implicate expressive or associational values. See footnote 23 of this opinion.

[25] In fact, the only case cited by the town in support of its contention that a beach park is not a public forum is *Chad* v. *Fort Lauderdale,* 861 F. Sup. 1057 (S.D. Fla. 1994). The Eleventh Circuit Court of Appeals expressly disavowed the federal district court's conclusion in *Chad* that the beach park at issue in that case was not a public forum but affirmed the judgment of the district court on the ground that the regulation at issue constituted a reasonable time, place and manner restriction. *Smith* v. *Fort Lauderdale,* 177 F.3d 954, 956–57 (11th Cir. 1999).

in *Naturist Society, Inc.* v. *Fillyaw*, 958 F.2d 1515, 1522 (11th Cir. 1992), the court concluded that John D. Mac-Arthur Beach State Park (park) in Florida is a public forum. In *Fillyaw*, members of the Naturist Society, Inc., a Wisconsin corporation that advocates a " 'clothing optional' lifestyle"; id., 1517; wished to demonstrate in the park. Id. The park manager issued a permit allowing the group to distribute literature but placed several restrictions upon the group's proposed demonstration. See id. Upon concluding that the park was a traditional public forum, the Eleventh Circuit Court of Appeals remanded the case to the district court to determine whether the restrictions constituted reasonable time, place and manner restrictions. Id., 1523. In reaching its conclusion that the park constituted a public forum, the court focused on the objective characteristics of the park, such as the presence of certain traditional park elements, including parking lots, a nature center and walkways.[26] Id., 1522; see also

---

[26] The court in *Fillyaw* explained that the beach park at issue in that case is, like Greenwich Point, a park that includes a beach: "The district court held that [the park] is a non-public forum. The court found that the park is not really a park but rather a beach, which the public visits to swim . . . play games, or merely rest under the sunshine enjoying the natural beauty of the scenery. . . . [The district court] distinguished the beach from a public street or city park on the grounds that beach visitors do not reasonably expect to be subjected to the full exercise of others' rights of free speech. . . . The court noted that beach visitors feel vulnerable to approaching speakers because the beach visitors are clad in fewer clothes than usual. . . . Because beach-goers sit or lie with their possessions arranged around them, the court observed, they cannot easily move when a person approaches to exercise his or her First Amendment rights. Finally, the court noted that the park has few law enforcement officers to ensure that speakers and solicitors are not overly bothersome to beach visitors.

"The district court believed it was stat[ing] the obvious when it remarked that the park is a beach. But . . . the park is more than a beach. . . . In particular, it contains parking lots, a nature center, and walkways. Speech and expressive conduct in these areas may not pose the same evils as on the beach. In declaring the park a non-public forum based solely upon its beach characteristics, the district court ignored other areas of the park which are not beach.

"Moreover, the facts the district court recites do not render the park a

*United States* v. *Frandsen*, supra, 212 F.3d 1237 n.4 (citing *Fillyaw* and finding error in the district court's conclusion that Canaveral National Seashore in Florida was not traditional public forum); *Smith* v. *Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999) ("[Eleventh Circuit] precedent conclusively establishes that the Fort Lauderdale Beach area . . . consisting of beach and sidewalk spaces . . . is a public forum").

A federal district court in the Second Circuit also has considered the question of whether a beach park is a public forum. In *Paulsen* v. *Lehman*, 839 F. Sup. 147, 161 (E.D.N.Y. 1993), the court concluded that Jones Beach State Park in New York is a traditional public forum. The court in *Paulsen* found the reasoning in *Naturist Society, Inc.* v. *Fillyaw*, supra, 958 F.2d 1515, "germane" and "compelling"; *Paulsen* v. *Lehman*, supra, 160; especially in light of "the striking similarities [between Jones Beach State Park and] the forum in *Fillyaw* . . . ." Id. The court proceeded to adopt the reasoning of *Fillyaw* with regard to the characteristics of the beach park forum; id., 160; see *Naturist Society, Inc.* v. *Fillyaw*, supra, 1522–23; and noted that Jones Beach State Park contains, among other things, picnic areas, parking areas, play areas and biking areas.

non-public forum. City parks are quintessential public forums. . . . In these parks, as at the beach, the public may swim, play games, rest, and enjoy the surroundings. Although the district court remarked on the small size of [the park], most city parks are even smaller, presenting the same space problems the district court contemplated. As at the beach, people sunbathe in city parks, sometimes in less than the usual amount of clothing, and they often arrange their possessions around themselves, making it difficult to move when someone approaches them. As at [the park], many city parks suffer a shortage of law enforcement personnel. In short, none of the facts the district court found adequately distinguish[es] [the park at issue in this case] from a typical city park for First Amendment purposes." (Citations omitted; internal quotation marks omitted.) *Naturist Society, Inc.* v. *Fillyaw*, supra, 958 F.2d 1522–23.

*Paulsen* v. *Lehman,* supra, 159.[27] The court in *Paulsen* also relied on *Gerritsen* v. *Los Angeles,* 994 F.2d 570 (9th Cir. 1993), in which the Ninth Circuit Court of Appeals rejected the defendant's contention that certain "blue-line areas" in El Pueblo Park of Los Angeles, California, were distinct from the rest of the park for public forum purposes. Id., 576. According to the defendant, one area had a "unique historic and cultural atmosphere . . . designed to foster commercial exchange"; id.; while another area was "semi-private in nature and [had] particular functions to carry out . . . necessitat[ing] separation from activities in other areas of [El Pueblo Park]." Id. This argument failed to persuade the Ninth Circuit Court of Appeals, which concluded that the areas were "indistinguishable from other sections of the park in terms of visitors' expectations of [their] public forum status." Id. Accordingly, the blue-line areas were held to be part of the larger part of El Pueblo Park, which is a traditional public forum. Id.

In view of the fact that Greenwich Point contains shelters, ponds, a marina, a parking lot, open fields, a nature preserve, walkways, trails, picnic areas with picnic tables, a library book drop and a beach, it is clear that Greenwich Point qualifies as a park for purposes of

[27] Although it is true that Greenwich Point is not as large as Jones Beach State Park or the Fort Lauderdale beach park at issue in *Smith* v. *Fort Lauderdale,* supra, 177 F.3d 954, Greenwich Point, which comprises slightly over 147 acres, is by no means small. Moreover, size bears little, if any, relevance to a determination of whether a particular piece of public property is a park and, therefore, a traditional public forum for purposes of the first amendment. See, e.g., *Kaplan* v. *Burlington,* 891 F.2d 1024, 1025, 1029 (2d Cir. 1989) (dictum concluding that two and one-half acre City Hall Park in Burlington, Vermont, is "indisputably a public forum"); *McCreary* v. *Stone,* 739 F.2d 716, 719, 722 (2d Cir. 1984) (affirming district court's determination that 3257 square foot Boniface Circle in Scarsdale, New York, is public forum); *Flamer* v. *White Plains,* 841 F. Sup. 1365, 1368, 1374 (S.D.N.Y. 1993) (concluding that two city parks, one less than one-half acre and other two acres in size, are traditional public fora).

first amendment analysis.[28] The fact that Greenwich Point has a boundary on the Long Island Sound that serves as a beach for swimming, sun bathing and other activities in no way alters its character as a park. As such, it is a traditional public forum.[29]

"The government can exclude a speaker from a traditional public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." (Internal quotation marks omitted.) *Arkansas Educational Television Commission* v. *Forbes*, supra, 523 U.S. 677, quoting *Cornelius* v. *NAACP Legal Defense & Educational Fund*, supra, 473 U.S. 800. "In a public forum, by definition, all parties have a constitutional right of access and the State must demonstrate compelling reasons for restricting access to a single class of speakers . . . ." *Perry Educational Assn.* v. *Perry Local Educators' Assn.*, supra, 460 U.S. 55. Traditional public fora have "objective characteristics . . . [that] require the government to accommodate private speakers." *Arkansas Educational Television Commission* v. *Forbes*, supra, 678.

In *Warren* v. *Fairfax County*, 196 F.3d 186 (4th Cir. 1999), an en banc panel of the Fourth Circuit Court of

---

[28] In addition, we note that photographs were introduced into evidence at trial to show a sand castle exhibition on the beach, along with a sand sculpture depicting a giant hand clawing its way onto a ledge cut into the beach with an adjacent sign stating: "Stamford Law Student Gaining Access to Greenwich Beach." The plaintiff also introduced into evidence copies of pamphlets distributed on the beach seeking to mobilize support and contributions for the town's legal effort, in conjunction with the association, to defeat the plaintiff's lawsuit. Finally, testimony adduced at trial indicated that candidates for public office have campaigned at Greenwich Point, and that both the Democratic and Republican parties and the National Association for the Advancement of Colored People have hosted gatherings there.

[29] We do not mean to suggest that a municipal beach without some or all of the other attributes of Greenwich Point would not constitute a park— and, therefore, a traditional public forum—for first amendment purposes. We simply conclude that Greenwich Point undoubtedly is a park for such purposes.

Appeals struck down as unconstitutional county restrictions that limited use of a large, grassy mall[30] to "county residents, county employees, and county non-profits . . . ." Id., 189. In *Warren*, the court determined that the mall had the "characteristics of a traditional public forum." Id. Accordingly, the court concluded that the defendant's "exclusion of [nonresidents was] not a reasonable time, place, or manner restriction." Id., 198 (addendum to majority opinion). Moreover, the exclusion was not "narrowly tailored to achieve compelling state interests." Id. (addendum to majority opinion). The court proceeded to describe the compelling interests that the county had offered in justifying the exclusion. "[Even if it is] assum[ed] that at least some of [the] interests [proffered by the defendant] are compelling, the residents only policy must be struck down because it is not narrowly tailored to achieve any of these ends. While narrow tailoring under the time, place, and manner standard does not require use of the least-restrictive alternative . . . the [defendant] may not burden substantially more speech than is necessary to further its interests . . . . [In this case] the [defendant's] policy burdens substantially more speech than necessary to further any of its asserted interests. The [defendant] has closed this public forum to the entire world of speakers except the class of qualified persons. The same interests could be achieved with much less burden by the simple expedients of charging fees for upkeep and monitoring costs . . . ." (Citations omit-

---

[30] The court gave the following description of the mall: "Stretching in front of the Fairfax County Government Center Complex is a large grassy mall, approximately thirty yards wide and spanning about 200 yards . . . . Sidewalks circumnavigate the mall and amble along a central landscaped strip. The area of the mall abutting the Government Center Complex features a circular brick promenade complemented by additional landscaping. Surrounding the mall is the street which leads to the Government Center Complex. The entire mall is outdoors, unenclosed, publicly accessible, and in fact open to the public." *Warren* v. *Fairfax County*, supra, 196 F.3d 188.

ted.) Id., 198 (addendum to majority opinion);[31] see also *Florida State Conference of NAACP Branches* v. *Daytona Beach*, 54 F. Sup. 2d 1283, 1288 (M.D. Fla. 1999) ("[G]ranting the [vehicular] passes proposed in the [Traffic Management Plan only to] Daytona Beach residents, registered hotel guests, and business owners and their employees does not comport with the First Amendment's guarantee that the right of assembly will not be tied to an individual's economic status or residence. . . . [The plan] constitute[s] an unwarranted impediment to freedom of assembly in the Daytona Beach area."). Succinctly put, "the First Amendment does not permit government to condition a speaker's access to a public forum on whether the speaker has support in or an indigenous relationship with the local community." *Million Youth March, Inc.* v. *Safir*, 18 F. Sup. 2d 334, 344 n.65 (S.D.N.Y. 1998).[32]

---

[31] In his concurring opinion in *Warren* v. *Fairfax County*, supra, 196 F.3d 198, Chief Judge J. Harvie Wilkinson III makes the following compelling observation about the potential consequences of a residency restriction on the use of public property: "[The plaintiff] asks nothing more than to spread and celebrate the message of her faith in a large, common, open-air public space. She was denied the right to speak solely because she was not a resident of Fairfax County, but rather of an independent city surrounded by the County. To limit a forum such as this one to those who live within the jurisdiction is to balkanize our civic dialogue. Were the Freedom Riders to be denied access to public fora in the South because they came from out of state? Is a Vermonter to be denied access to an Ohio public forum if he wishes to bring attention to the problem of acid rain? Is a pro-life Ohioan to be disallowed from protesting pro-choice developments in Virginia? And are Virginians, who are concerned about garbage trucked into their state from New York, to be prohibited from protesting such actions in a New York public forum?

"Speech in America cannot be that parochial." Id., 199 (Wilkinson, C. J., concurring).

[32] See also *Lerman* v. *Board of Elections*, 232 F.3d 135, 152 (2d Cir. 2000) ("[a] desire to fence out non-residents' political speech—and to prevent both residents and non-residents from associating for political purposes across district boundaries—simply cannot be reconciled with the First Amendment's purpose of ensuring the widest possible dissemination of information from diverse and antagonistic sources" [internal quotation marks omitted]); *Krislov* v. *Rednour*, 226 F.3d 851, 866 (7th Cir. 2000) ("Allowing citizens of the other forty-nine States to circulate petitions

In the present case, the town has failed to explain why the ordinance's virtual ban on nonresidents is a reasonable time, place or manner restriction on the use of the park by such nonresidents. Moreover, even if we assume that the town has a compelling interest in restricting nonresident access to the park—an assumption that finds no support in the record—the ordinance is not narrowly tailored to accomplish that end. See, e.g., *Warren* v. *Fairfax County*, supra, 196 F.3d 198. Consequently, the ordinance does not pass federal constitutional muster.

It is apparent, moreover, that the ordinance violates the first amendment both as applied to the plaintiff and for substantial overbreadth. With respect to the former ground for finding the ordinance unconstitutional, the town lawfully cannot bar the plaintiff from Greenwich Point due solely to the fact that he is a nonresident because the park is a *public* forum. *Perry Educational Assn.* v. *Perry Local Educators' Assn.*, supra, 460 U.S. 55 ("[i]n a public forum, by definition, all parties have a constitutional right of access"). Furthermore, the ordinance bars a large class of nonresidents, namely, all nonresidents who cannot find a resident host, from engaging in a multitude of expressive and associational activities at Greenwich Point. See, e.g., J. Stevens, "The Freedom of Speech," 102 Yale L.J. 1293, 1298 (1993) ("constitutionally protected forms of communication include [inter alia] parades, dances, artistic expression, picketing, wearing arm bands . . . [and] music"). Because the town's restriction on the use of Greenwich Point by nonresidents cannot be justified on the ground

increases the opportunity for the free flow of political ideas. In some cases this might entail the introduction of ideas which are novel to a particular geographic area, or which are unpopular. But the First Amendment 'was designed to secure the widest possible dissemination of information from diverse and antagonistic sources to assure unfettered interchange of ideas for the bringing about of political and social change desired by the people.' " [Quoting *Buckley* v. *Valeo*, 424 U.S. 1, 49, 96 S. Ct. 612, 46 L. Ed. 2d 659 [1976].).

that it is narrowly tailored to meet a compelling need, the ordinance is facially overbroad.[33] The ordinance, therefore, cannot withstand scrutiny under the first amendment, either as applied to the plaintiff or as applied to other nonresidents who might wish to enter Greenwich Point.

## III

We now turn to the plaintiff's claim under article first, §§ 4, 5 and 14, of the state constitution. We agree with the plaintiff that the ordinance also violates these provisions of the state constitution, both as applied to the plaintiff's conduct in this case and on its face.

This court explicitly has stated that the Connecticut constitution, under article first, §§ 4, 5 and 14, provides greater protection for expressive activity than that provided by the first amendment to the federal constitution. *State* v. *Linares*, supra, 232 Conn. 380–81.[34] In *Linares*,

---

[33] A finding of overbreadth results in the striking down of a challenged law in its entirety: "[A determination of overbreadth] . . . results in the invalidation of a law 'on its face' rather than 'as applied' to a particular speaker. Ordinarily, a particular litigant claims that a statute is unconstitutional as applied to him or her; if the litigant prevails, the courts carve away the unconstitutional aspects of the law by invalidating its improper applications on a case-by-case basis. If a law restricting speech is invalidated as applied to a protected speaker, it is held inapplicable to that speaker and thus, in effect, judicially trimmed down. Overbreadth analysis, in contrast, does not reach the question whether the challenger's speech is constitutionally protected; instead it strikes down the statute entirely, because it might be applied to others not before the Court whose activities are constitutionally protected. When invalidated for overbreadth, a law is not narrowed, but rather becomes wholly unenforceable until a legislature rewrites it or a properly authorized court construes it more narrowly." K. Sullivan & G. Gunther, First Amendment Law (1999) pp. 321–22.

[34] "In deciding whether our state constitution demands such an interpretation, we [recognize] that federal constitutional law sets minimum national standards for individual rights and that states may afford individuals greater protections under their own state constitutions. *State* v. *Miller*, 227 Conn. 363, 379, 630 A.2d 1315 (1993); *State* v. *Oquendo*, 223 Conn. 635, 649, 613 A.2d 1300 (1992); *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992). Although we often look to United States Supreme Court precedent when construing related provisions in our state constitution, we may determine that the protections afforded to the citizens of this state by our own constitu-

we declined "to follow the modern, forum based approach currently employed . . . under the first amendment . . . ." Id., 379. Instead, we adopted the "compatibility" test set forth in *Grayned* v. *Rockford*, supra, 408 U.S. 104, under which "the crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." Id., 116; see *State* v. *Linares*, supra, 379. Under that standard, the state cannot restrict a person's access to public property unless that person intends to engage in expressive activity that is "basically incompatible" with the customary use of the property at the time in question. See *State* v. *Linares*, supra, 386–87. "This emphasis on basic compatibility, rather than on categorization of particular types of public property, reflect[s] [this] court's attempt to serve the [constitutionally important] value of maximizing social communication." (Internal quotation marks omitted.) Id., 378.

In *Linares*, we underscored the fact that the *Grayned* test "is designed to maximize the speech which the government is constitutionally required to tolerate, consistent with the appropriate and needful use of its property. This design flows naturally from the first amendment's central objective of ensuring uninhibited, robust, and wide-open public debate." (Internal quotation marks omitted.) *State* v. *Linares*, supra, 232 Conn. 383–84.[35] This approach, we concluded, reflects the fact

tion go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. *State* v. *Dukes*, 209 Conn. 98, 112, 547 A.2d 10 (1988); *State* v. *Stoddard*, 206 Conn. 157, 166, 537 A.2d 446 (1988); *State* v. *Kimbro*, 197 Conn. 219, 235–36, 496 A.2d 498 (1985)." (Internal quotation marks omitted.) *State* v. *Linares*, supra, 232 Conn. 378–79.

[35] As the United States Supreme Court in *Grayned* stated, "[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. . . . The right to use a public place for expres-

that "article first, §§ 4, 5 and 14 . . . include . . . language that suggests that our state constitution bestows greater expressive rights on the public than that afforded by the federal constitution. . . . [T]hese differences warrant an interpretation separate and distinct from that of the first amendment. . . . We are persuaded that *Grayned*'s fact specific, flexible approach will offer more protection to freedom of speech as envisioned in our state constitution." (Citations omitted; internal quotation marks omitted.) Id., 380–81.[36]

The challenged ordinance unquestionably violates the plaintiff's right to engage in protected expressive and associational activities under the more speech protective test that we have adopted for purposes of article first, §§ 4, 5 and 14, of our state constitution. The plain-

---

sive activity may be restricted only for weighty reasons." (Citations omitted; internal quotation marks omitted.) *Grayned* v. *Rockford*, supra, 408 U.S. 115.

[36] In *Linares*, we also noted that "the flexible . . . *Grayned* approach will best enable our courts to adapt the central tenets of free speech jurisprudence to the ever changing nature of public expression and communication in modern society. As aptly expressed by [United States Supreme Court] Justice [Anthony M.] Kennedy, '[i]n a country where most citizens travel by automobile, and parks all too often become locales for crime rather than social intercourse, our failure to recognize the possibility that new types of government property may be appropriate forums for speech will lead to a serious curtailment of our expressive activity.' [*International Society for Krishna Consciousness, Inc.* v.] *Lee*, supra, 505 U.S. 697–98 (Kennedy, J., concurring [in the judgments]). Further, this flexible approach prohibits the government from unilaterally and unnecessarily limiting speech at public locations; it avoids the 'grant of plenary power [that] allows the government to tilt the dialogue heard by the public, to exclude many, more marginal, voices.' Id., 702 [Kennedy, J., concurring in the judgments]." *State* v. *Linares*, supra, 232 Conn. 386.

We further stated in *Linares* that, "[i]n assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest." (Internal quotation marks omitted.) Id. "Access to the streets, sidewalks, parks, and other similar public places . . . for the purpose of exercising [first amendment rights] cannot constitutionally be denied broadly . . . . Free expression must not, in the guise of regulation, be abridged or denied." (Internal quotation marks omitted.) *Grayned* v. *Rockford*, supra, 408 U.S. 117.

tiff's stated reason for seeking admission to Greenwich Point, namely, to associate with others at the park and to exchange ideas and information, implicates constitutionally protected conduct that is entirely compatible with activities customarily engaged in at Greenwich Point. See *State* v. *Linares*, supra, 232 Conn. 378. Thus, the plaintiff is entitled to prevail on his as applied state constitutional challenge to the ordinance.

The ordinance also is facially overbroad in violation of the state constitution[37] because it "sweeps within its proscription conduct protected by . . . [state constitutional principles of freedom of expression and association]." (Internal quotation marks omitted.) *Ramos* v. *Vernon*, supra, 254 Conn. 812. One easily can conceive of a wide range of core expressive and associational activity in which a nonresident might wish to engage at Greenwich Point that is perfectly compatible with the customary or normal activity there. Although the number and kind of such activities virtually are limitless, they would include sitting or walking on the beach in a T-shirt that expresses a particular political view or religious conviction, distributing literature or pamphlets in the parking lot, walkway or at a picnic table, participating in a silent vigil anywhere in the park, and soliciting signatures for a petition at the entrance to the park.[38] Under the challenged ordinance, however, a nonresident who is unable to find a town resident to accompany him or her to Greenwich Point will be unable to engage in any such protected activity. The

---

[37] This court recently has entertained claims that a particular statute or ordinance is facially overbroad in violation of article first, §§ 4, 5 and 14, of the state constitution. See *Ramos* v. *Vernon*, supra, 254 Conn. 811; *State* v. *Linares*, supra, 232 Conn. 377.

[38] Thus, under the "basic compatibility" test that this court has adopted for purposes of article first, §§ 4, 5 and 14, of the state constitution, it is clear that a town cannot broadly restrict nonresident access to a town beach even if that property, in contrast to Greenwich Point, contains no other attractions or activities and, therefore, is used solely as a beach.

ordinance, therefore, cannot withstand the plaintiff's state constitutional overbreadth challenge.[39]

## IV

In light of our conclusion that the town cannot restrict access to Greenwich Point on the basis of residency, we also must address: (1) the plaintiff's claim that any agreement between the town and the association to restrict access to Greenwich Point is unenforceable; (2) the association's claim that the use of the easement over its property is restricted to town residents and their guests;[40] and (3) the plaintiff's claim that he is entitled to injunctive relief against the association. We conclude that any agreement between the town and the association is unenforceable and, furthermore, that the plaintiff is entitled to a judgment against the association

---

[39] Indeed, a contrary conclusion would yield untenable results. The following hypothetical, but not implausible, set of facts provides one such example: Assume that the state senator who represents the thirty-sixth senatorial district, which comprises Greenwich and parts of Stamford and New Canaan, is a Greenwich resident, whereas her opponent for reelection is a Stamford resident. Pursuant to the ordinance, the senator would be permitted to enter Greenwich Point on any day, at any time, to speak to her numerous constituents there. By contrast, her challenger could not enter Greenwich Point to engage in similar activity unless accompanied by a Greenwich resident. In such circumstances, the residents of Greenwich could, in effect, exercise a veto over the use of public property by their fellow resident's opponent. Even if it is assumed that the challenger could find a resident to host a visit or two to Greenwich Point, the requirement of a resident host might well make additional visits there by the challenger more difficult and, therefore, less likely, especially if the challenger is a splinter candidate or espouses unpopular or controversial views. The constitution, however, prohibits a scenario in which two candidates for the same office are governed by a different set of rules regarding access to *public property* for campaign purposes; the challenger is entitled to a level playing field when that field is publicly owned.

[40] As we have indicated; see footnote 15 of this opinion; this claim, raised by the association for the first time on appeal, is predicated upon the trial court's statement in its memorandum of decision that "the [association] has proved to the court that the easement granted to the town was done . . . with the intention that only Greenwich residents (and their guests) use the easement."

declaring as much. For the reasons that follow, we also reject the association's contention that, on the basis of its 1945 agreement with the town, the easement over its property may be used only by town residents and their guests.[41] We conclude, however, that the plaintiff is not entitled to any other relief affecting the property rights of the association.

The following additional facts and procedural history are relevant to our resolution of the foregoing issues. On appeal to this court, the association relies on the trial court's dictum in its memorandum of decision that *"the easement granted to the town* was done . . . with the intention that only Greenwich residents (and their guests) use the easement."* (Emphasis added.) In particular, the association claims that the court's finding supports its contention that a new easement, that is, one that superseded the original 1892 easement, was created in 1945. If the association is correct, then the current easement is restricted to Greenwich residents and their guests.

The plaintiff, on the other hand, maintains that any agreement between the town and the association in 1945 did not create a new easement.[42] He claims, rather, that any such mutual understanding was, at most, an agreement pursuant to which the association promised not to oppose the town's purchase of Greenwich Point in return for the town's promise to adopt a residents only policy for Greenwich Point. Under this view, the agreement does not run with the land; it merely constitutes a bilateral agreement entered into by the parties

---

[41] As we explain hereinafter, the operative easement is the easement that was created in 1892 in favor of the town's predecessor in interest, namely, Tod.

[42] The plaintiff never has conceded that this course of conduct constituted an "agreement" between the town and the association. Nevertheless, for ease of reference, and because it is not material to our resolution of the plaintiff's claim against the association, we refer to it as such.

to promote: (1) the town's interest in purchasing Greenwich Point; and (2) the association's interest in limiting the number of persons who would need to traverse its property to gain access to Greenwich Point. We agree with the plaintiff that a new easement was not created in 1945.

We note, first, that the association did not claim, either at trial or in its pretrial or posttrial briefs, that a *new* easement (that is, an easement the scope of which superseded the scope of the easement granted by Ferris to Tod in 1892) had been created over the driftway by virtue of the mutual promises of the town and the association. Rather, the association asserted that: (1) it had resolved not to oppose the sale of Greenwich Point to the town on condition that the town adopt a residents only policy; (2) the town, in light of the association's resolution, adopted a residents only policy; and (3) the association, in reliance on that policy, did not oppose the sale.

For several reasons, it is quite clear that the 1945 agreement did not create a new easement.[43] First, neither the town nor the association raised any such claim in the trial court; indeed, there is absolutely nothing in the record of the trial court proceedings to suggest that the town or the association conceived of the agreement in such a manner. In fact, the trial court's statement regarding the "easement granted to the town" is the very first time that *anyone* involved in this case ever had suggested that the parties' agreement effected a *new* easement. Second, the association's arguments at trial were inconsistent with a contention that a new easement was created in 1945. For example, counsel

[43] The issue of whether a new easement was created gives rise to a question of law. See, e.g., *Bolan* v. *Avalon Farms Property Owners Assn., Inc.*, 250 Conn. 135, 142, 735 A.2d 798 (1999). Consequently, our review of the trial court's determination of that issue is plenary. E.g., *Lightowler* v. *Continental Ins. Co.*, 255 Conn. 639, 644 n.11, 769 A.2d 49 (2001).

for the association expressly represented to the trial court that maintenance of the residents only policy "is the only way that legally enforceable rights of the association can be protected."[44] If the 1945 agreement did, in fact, give rise to a new easement, then the association could have protected its "rights" simply by enforcing the residents only restriction of that new easement. Third, the trial court's memorandum of decision is devoid of any discussion of the 1892 easement; indeed, the memorandum of decision contains no reference whatsoever to the 1892 easement, to the history of the relevant properties or to their use prior to 1994 when the plaintiff sought to gain entrance to Greenwich Point. Finally, it is doubtful that the agreement meets the legal requirements of an easement due to: (1) a lack of evidence to establish the parties' intent, in 1945, to extinguish the 1892 easement and create a new easement; and (2) the manner in which the parties' agreement was memorialized.[45] It is apparent, therefore, that the trial court's dictum indicating that a new easement was created in 1945 is incorrect both as a matter of fact and as a matter of law. Thus, the association cannot prevail on its claim that, on the basis of the trial court's finding, the easement over its property is limited to residents.

We turn next to the issue of what relief, if any, the plaintiff is entitled to against the association. As we previously have indicated; see footnote 12 of this opinion; the plaintiff seeks a judgment declaring that the

---

[44] See footnote 15 of this opinion.

[45] For example, the record contains little or no evidence to indicate that the parties believed that they were creating an easement, and, even if the evidence suggested otherwise, it is highly questionable whether the minutes of the town and association meetings that reflect the parties' agreement would satisfy the statute of frauds. See General Statutes § 52-550 (a) (4); cf. 1 Restatement (Third), Property, Servitudes § 2.8, pp. 131–32 (2000). Moreover, neither the trial court nor the parties ever addressed these threshold issues.

association has no right to the enforcement of the town's residents only policy. Because we have concluded that the ordinance is unconstitutional, we agree with the plaintiff that enforcement of the association's 1945 agreement with the town would be contrary to public policy. The plaintiff, therefore, is entitled to a declaratory judgment providing that the agreement is unenforceable.

The plaintiff, in his prayer for relief, also sought an injunction against *both* the town and the association prohibiting them from "limiting [his] entry and access to" Greenwich Point. See footnote 12 of this opinion. The plaintiff, however, is not entitled to any further declaratory or injunctive relief *against the association*. With respect to declaratory relief, the plaintiff sought nothing more than a declaration that the agreement between the town and the association affords the association no right to enforcement of the terms of the ordinance. With respect to injunctive relief, the plaintiff has not established—indeed, he never *tried* to establish—that the unconstitutionality of the ordinance *requires the association* to grant him access over its property to Greenwich Point.

The plaintiff asks us to affirm, inter alia, that part of the judgment of the Appellate Court directing the trial court to grant the plaintiff injunctive relief against the association. The plaintiff's sole basis for such a request, however, is his contention that the Appellate Court was correct in its reasoning that the public trust doctrine required that he be granted access to Greenwich Point over the association's driftway. As we explained previously; see footnote 17 of this opinion; the public trust doctrine does not extend that far. Furthermore, neither the federal constitution nor the state constitution governs private, as opposed to governmental, conduct in this realm. See, e.g., *Hudgens* v. *National Labor Relations Board*, 424 U.S. 507, 513, 96 S. Ct. 1029, 47 L. Ed.

2d 196 (1976) ("the constitutional guarantee of free speech is a guarantee only against abridgment by government . . . [and] while statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the Constitution itself"); *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 59–63, 469 A.2d 1201 (1984) (concluding that state constitutional provisions guaranteeing freedom of expression were intended to protect against state action as opposed to private conduct). On this record, therefore, the plaintiff has presented no persuasive reason why the Appellate Court's reasoning vis-a-vis the association should be sustained.

It may be that, under applicable property law or other legal doctrines, the plaintiff and other nonresidents have a right to use the easement created over the driftway in 1892 to gain access to Greenwich Point, the dominant estate, from the property of the association, the servient estate. To the contrary, however, it may be that, if the easement were opened to all persons, it would become overburdened; see *Il Giardino, LLC* v. *Belle Haven Land Co.*, 254 Conn. 502, 513, 757 A.2d 1103 (2000) ("the owner of the easement appurtenant may not materially increase the burden of the easement upon the servient estate"); or that other applicable property law or other legal doctrines would allow the association to limit the use of the easement, or that, failing such limitation, the easement would revert to the association and cease to exist. These issues were not fully explored or litigated at trial and certainly were not fully determined by the trial court. The resolution of these issues will have to await the outcome of what the parties do or do not do in the wake of this decision and will depend on what further remedies any of them may

seek.[46] Insofar as the plaintiff's claims against the association are concerned, the issue in this case is limited to whether the association has a right to enforcement of the ordinance's residency requirement. Consequently, the plaintiff is not entitled to a judgment that purports to settle the *property rights* of the association.

As we have noted; see part I of this opinion; the Appellate Court directed the trial court "to render judgment for the plaintiff." *Leydon* v. *Greenwich*, supra, 57 Conn. App. 727. As we also have noted, the plaintiff sought declaratory and injunctive relief against *both*

---

[46] For example, as we have indicated, the association may seek to raise a claim of overburdening in any future litigation regarding the scope of the easement. That litigation, if any, would be between the association, as the successor to the grantor of the easement, and the town, as the present owner of the easement. Although that claim, which was asserted by the association as a reason why the trial court should not strike down the ordinance, was rejected by the trial court, the association, for several reasons, would not be foreclosed by principles of res judicata or collateral estoppel from asserting it in any subsequent litigation. Among those reasons is the fact that the trial court's finding on overburdening was dictum and, therefore, not essential to its judgment. E.g., *Dowling* v. *Finley Associates, Inc.*, 248 Conn. 364, 374, 727 A.2d 1245 (1999) ("[i]f an issue has been determined, but the judgment is not dependent upon the determination of the issue, the parties may relitigate the issue in a subsequent action" [internal quotation marks omitted]). Furthermore, the association never had an incentive to appeal the court's adverse finding on overburdening because the association prevailed in the trial court notwithstanding that determination. See, e.g., *State* v. *McDowell*, 242 Conn. 648, 655–56, 699 A.2d 987 (1997) (principles of issue preclusion inapplicable unless party against whom preclusion is sought had adequate incentive to litigate issue fully and fairly).

It also should be noted that the trial court—again, in dictum—*did* find that opening the beach to nonresidents likely would have an adverse affect on the ecology of the area. Of course, the association would have the right to raise that issue in any future litigation regarding the use of the easement over its property.

Finally, although we have addressed the possibility of future litigation regarding the easement, we have done so only to clarify: (1) the issues that have and have not been resolved in this case; and (2) the fact that the easement created in 1892 is, as of now, the operative easement. We express no view whatever on the wisdom or merits of any future litigation that may arise regarding that easement or any issue not otherwise determined in the present case.

the town and the association. It thus appears that the Appellate Court directed the trial court to render judgment *against the town* declaring the ordinance unenforceable and enjoining the town from denying the plaintiff access to Greenwich Point. In those respects, the judgment of the Appellate Court should be affirmed. It also appears, however, that the Appellate Court directed the trial court to render judgment *against the association* declaring that the association is not entitled to enforcement of the ordinance *and* enjoining the association from denying the plaintiff access to Greenwich Point via the association's property. Insofar as the judgment of the Appellate Court directs the trial court to render judgment granting the plaintiff declaratory relief against the association, the judgment of the Appellate Court should be affirmed; insofar as the judgment of the Appellate Court directs the trial court to render judgment granting the plaintiff *injunctive* relief against the association, the judgment of the Appellate Court should be reversed.

That part of the judgment of the Appellate Court directing the trial court to render judgment for the plaintiff enjoining the association from denying the plaintiff access to Greenwich Point via the association's property is reversed and the case is remanded to the Appellate Court with direction to affirm the judgment of the trial court only as to the plaintiff's claim for injunctive relief against the association. The judgment of the Appellate Court is affirmed in all other respects.

In this opinion the other justices concurred.