# STATE OF CONNECTICUT *v.* CATHERINE BALL ET AL.
## (SC 14646)

Sullivan, C. J., and Borden, Norcott, Vertefeuille and Zarella, Js.

Argued December 6, 2001—officially released May 21, 2002

*Kathleen Eldergill*, for the appellants (defendants).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *Frank S. Maco*, state's attorney, *Jack Fischer*, senior assistant state's attorney, and *Guy Wolf*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The defendants,[1] who had been convicted, following conditional pleas of nolo contendere, of violating Connecticut's Hunter Harassment Act, General Statutes § 53a-183a (act),[2] appeal from the judg-

___

[1] The defendants are Catherine Ball, Arlene Corey, Derek V. Oatis and William Mannetti.

[2] General Statutes § 53a-183a provides in relevant part: "(a) No person shall obstruct or interfere with the lawful taking of wildlife by another person at the location where the activity is taking place with intent to prevent such taking.

"(b) A person violates this section when he intentionally or knowingly: (1) Drives or disturbs wildlife for the purpose of disrupting the lawful taking of wildlife where another person is engaged in the process of lawfully taking

ment of the trial court, rendered after a hearing ordered on remand from this court, finding that: (1) state parks and forests are not public fora; (2) § 53a-183a is narrowly tailored to serve a significant state interest; and (3) the act leaves open sufficient alternative channels of communication. The defendants claim that the act violates the first and fourteenth amendments to the United States constitution[3] because state parks and forests are public fora that traditionally have been held open to the public for expressive activities and the act is not narrowly drawn to further a substantial state interest. In the alternative, the defendants argue that state parks and forests have been designated by the state as nontraditional public fora, the act is not narrowly tailored to serve a reasonable state interest, and the activities it prohibits are within the scope of activities permitted in a nontraditional public forum. Finally, the defendants argue that the act does not leave open alternative means of communication and that it sweeps so broadly as to be unconstitutional. We disagree with the defendants and affirm the judgment of the trial court.

The facts of this case are set forth in *State* v. *Ball,* 226 Conn. 265, 268–70, 627 A.2d 892 (1993). "On October

wildlife; (2) blocks, impedes or otherwise harasses another person who is engaged in the process of lawfully taking wildlife; (3) uses natural or artificial visual, aural, olfactory or physical stimuli to affect wildlife behavior in order to hinder or prevent the lawful taking of wildlife; (4) erects barriers with the intent to deny ingress or egress to areas where the lawful taking of wildlife may occur; (5) interjects himself into the line of fire; (6) affects the condition or placement of personal or public property intended for use in the lawful taking of wildlife in order to impair its usefulness or prevent its use; or (7) enters or remains upon private lands without the permission of the owner or his agent, with intent to violate this section. . . ."

[3] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ." The first amendment is applicable to the states through the fourteenth amendment. The defendants are pursuing their claim under the federal constitution only and are not challenging the act under the state constitution.

19, 1991, at 6:25 a.m., Robert Dubois, a bow hunter with a valid state archery license, was standing at the entrance to the Tunxis State Forest Wildlife Management Area in Hartland, waiting to enter the park. The area is state owned property subject to regulation by the department of environmental protection. On the day in question, a person with a valid archery license could legally engage in archery hunting in the state forest after 7 a.m.

"The defendants approached Dubois and told him that they were antihunting activists and that they would follow him into the park. A few minutes later, conservation officer McNamara arrived at the scene. Dubois complained to McNamara that the defendants were planning to harass him. McNamara warned the defendants that, if they interfered with Dubois' hunting, they would be subject to arrest. Dubois told the defendants that he planned to hunt deer from an old apple orchard and asked that he be left alone.

"At about 7 a.m., Dubois entered the orchard, took a stand under a tree, and notched an arrow into his bow. The defendants formed a semicircle facing Dubois and tried to dissuade him from hunting. Dubois told them that they were interfering with his hunting and asked them to get out of the line of fire. When the defendants did not move, Dubois asked McNamara to come to his assistance. McNamara explained to the defendants that their interference with Dubois' hunting was illegal and asked them to leave. After consulting among themselves, the defendants decided to be arrested rather than to comply with the request to leave the area. McNamara then arrested the defendants.

"In their motions to dismiss in the trial court, the defendants challenged the constitutionality of § 53a-183a both facially and as applied to the facts of this case. The trial court, *Dranginis, J.*, ruled only on their

contention that the statute facially violates their rights to free speech. The defendants' subsequent pleas of nolo contendere precluded further pursuit of their alternate claim that the statute had been unconstitutionally applied in the factual circumstances of their cases." Id., 268–69.

The trial court prohibited evidence of the nature and extent of the state's interest in preventing the harassment of hunters and evidence of the particular circumstances of the defendants' arrest because a challenge premised on facial unconstitutionality does not require a factual showing. Id., 269. The trial court also found that the communicative aspect of the conduct that the act proscribes implicates and thus falls within the constraints of the first amendment's protection of free speech, as had a predecessor statute that previously had been held to be facially unconstitutional in *Dorman* v. *Satti*, 862 F.2d 432 (2d Cir. 1988), cert. denied, 490 U.S. 1099, 109 S. Ct. 2450, 104 L. Ed. 2d 1005 (1989). *State* v. *Ball*, supra, 226 Conn. 269. The court concluded, nevertheless, "that the statute is content-neutral and that its restrictions are narrowly tailored to serve a significant governmental interest. The court then rejected the defendants' claim of vagueness and overbreadth, in part by narrowly construing some of the provisions contained in the statute." Id., 269–70.

The defendants first appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to what was then Practice Book § 4023, now § 65-1, and General Statutes § 51-199 (c). *State* v. *Ball*, supra, 226 Conn. 267. The defendants claimed on appeal that: (1) the act is a content-based constraint on free speech; (2) even if the act is content-neutral, it is not narrowly tailored to further a significant state interest, as required for speech restrictions in a public forum; and (3) even if the act is content-neutral and does not regulate speech in a

public forum, it is facially overbroad or unconstitutionally vague. Id., 270. We concluded that: (1) the act implicates first amendment free speech protections; id., 272; and (2) "§ 53a-183a is content-neutral because it restricts all the expressive conduct proscribed by its terms, whenever such expressive conduct intentionally or wrongfully interferes with hunting. . . . [T]he statute does not, on its face, single out a particular point of view for discriminatory treatment." Id., 275. We also concluded, however, that the factual record was not sufficiently developed for this court to determine whether the properties in dispute were public or nonpublic. Id., 278. Furthermore, the record was not sufficiently developed for us to determine the nature and the seriousness of the state interest that purported to justify the regulation. Id. Accordingly, we remanded the case to the trial court for an evidentiary hearing on those issues. Id. After a hearing on our remand, the trial court determined that undeveloped state parks and state forests were nonpublic fora, that § 53a-183a was narrowly tailored to serve a significant state interest, and that the statute left open ample alternative channels for communication. This second appeal followed. Additional facts will be set forth as necessary.

I

## BURDEN OF PROOF AND STANDARD OF REVIEW

"In our assessment of whether the statute passes constitutional muster, we proceed from the well recognized jurisprudential principle that [t]he party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality." (Internal quotation marks omitted.) *State* v. *Ross*, 230 Conn. 183, 236, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). "The burden of proving

unconstitutionality is especially heavy when, as at this juncture, a statute is challenged as being unconstitutional on its face." Id., citing *State* v. *Floyd*, 217 Conn. 73, 78, 584 A.2d 1157 (1991).

The defendants assert that where trial court rulings implicate first amendment rights, an appellate court must "make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." (Internal quotation marks omitted.) *Brown* v. *K.N.D. Corp.*, 205 Conn. 8, 11, 529 A.2d 1292 (1987). The defendants argue that, in reviewing this case, we should not apply a clearly erroneous standard but instead must conduct an independent review of the facts and draw our own inferences from those facts without deference to the factual findings of the trial court. We disagree.

The parties do not dispute the facts surrounding the defendants' arrest, and the defendants challenge the constitutionality of the act on its face, not as it has been applied to them. Independent review of those facts, therefore, is unnecessary to our consideration of the defendants' facial challenge "because an analysis of a 'facial' type of claim is not dependent on the facts of a particular case." *State* v. *Linares*, 232 Conn. 345, 363 n.14, 655 A.2d 737 (1995); see also *Ramos* v. *Vernon*, 254 Conn. 799, 849 n.4, 761 A.2d 705 (2000) (*Sullivan, J.*, dissenting), quoting *37712, Inc.* v. *Ohio Dept. of Liquor Control*, 113 F.3d 614, 618 n.7 (6th Cir. 1997) ("[n]o essential issues of material fact are presented for resolution upon a facial challenge to a statute or ordinance" [internal quotation marks omitted]). We would conduct an examination of the facts surrounding the defendants' arrest only if the defendants were also challenging the act as it was applied to them.

## II

## DETERMINATION OF FORUM STATUS

We first must classify the public lands at issue in this case—state parks and forests where the taking of game and wildlife is permitted and also protected by the act.[4] In *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983), the United States Supreme Court identified three separate classifications for publicly owned property, namely public fora, nonpublic fora and nontraditional public fora. First, the court set forth the standards for public fora. "In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. . . . [In these public fora] [t]he State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." (Citations omitted; inter-

---

[4] Although the defendants would like us to classify all state parks and forests as public fora, including developed state parks, in this case we are concerned only with state forests, undeveloped state parks, and developed state parks that are sometimes designated as undeveloped in order to allow hunting in special circumstances. The defendants correctly point out that the act applies equally to fishing, which can take place in developed state parks, as support for their argument we should classify all state parks together. Nevertheless, we need not classify developed state parks as public fora, nonpublic fora, or nontraditional public fora in this case. As we discuss subsequently in part III of this opinion, the act is narrowly tailored to further a significant state interest, thereby satisfying the constitutional standard for content-neutral speech restrictions in public fora, which is the most stringent standard of the three forum classifications.

nal quotation marks omitted.) Id.; see also *Leydon* v. *Greenwich*, 257 Conn. 318, 337, 777 A.2d 552 (2001); *State* v. *Linares*, supra, 232 Conn. 367.

"A second category consists of public property which the State has opened for use by the public as a place for expressive activity. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. *Widmar* v. *Vincent*, 454 U.S. 263 [102 S. Ct. 269, 70 L. Ed. 2d 440] (1981) (university meeting facilities); *City of Madison Joint School District* v. *Wisconsin Employment Relations Comm'n*, 429 U.S. 167 [97 S. Ct. 421, 50 L. Ed. 2d 376] (1976) (school board meeting); *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U.S. 546 [95 S. Ct. 1239, 43 L. Ed. 2d 448] (1975) (municipal theater). Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest. *Widmar* v. *Vincent*, supra, [269–270]." *Perry Education Assn.* v. *Perry Local Educators' Assn.*, supra, 460 U.S. 45–46; see also *State* v. *Linares*, supra, 232 Conn. 368–69.

Finally, the court outlined the standards for nonpublic fora. "Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the First Amendment does not guarantee access to property simply because it is owned or controlled by the government. . . . In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. . . . As we

have stated on several occasions, [t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." (Citations omitted; internal quotation marks omitted.) *Perry Education Assn.* v. *Perry Local Educators' Assn.*, supra, 460 U.S. 46.

Thus, the United States Supreme Court has made it clear that the traditional uses of, and the intent of the state with regard to, the property in question are of critical importance in a forum analysis. In the present case, we agree with the state and the trial court that state forests and undeveloped state parks are properly classified as nonpublic fora.

The policy of the state with regard to its natural resources is "to conserve, improve and protect [the state's] natural resources and environment and to control air, land and water pollution in order to enhance the health, safety and welfare of the people of the state . . . and to manage the basic resources of air, land and water to the end that the state may fulfill its responsibility as trustee of the environment for the present and future generations." General Statutes § 22a-1.

The state presented evidence to the trial court that state parks and forests are an important part of the state's conservation responsibilities. From time immemorial, the state's uninhabited and undeveloped land traditionally has been used for hiking, picnicking, camping, hunting, trapping and fishing. As the state has developed and become more populated, the state forests and some state parks have been preserved in an undeveloped condition so as to continue to provide opportunities for these traditional uses. They are large areas that support varied wildlife, trees and other vegetation, protect watershed systems, provide wood and function as natural ecosystems for scientific study. The state has conserved and managed its undeveloped land primarily

for these traditional purposes, subject to some public safety restrictions. Overuse is discouraged by maintaining only limited parking and rough roadways, thereby preserving the land's undisturbed nature. Even state parks that are equipped with some basic facilities are maintained and established for the primary purpose of recreation.

The defendants presented evidence that state parks and forests have been used for Native American celebrations, historical reenactments, prayer meetings, political fundraisers and the practice of witchcraft. The defendants argue that these are also traditional uses of state parks and forests, and that these uses are of such primary importance that the disputed parks and forests are properly classified as public fora. We disagree.

Public fora are not simply publicly owned areas in which communication could or might take place. Rather, they must have traditionally been used "for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague* v. *Committee for Industrial Organization*, 307 U.S. 496, 515, 59 S. Ct. 954, 83 L. Ed. 1423 (1939). "[A] *principal purpose* of traditional public fora is the free exchange of ideas . . . ." (Emphasis added.) *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 800, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985). The defendants' evidence demonstrates only that the land in question is sometimes used for a variety of activities that do not require undisturbed land, as do hunting, hiking, fishing and trapping. In light of the evidence presented by the state, however, we are not persuaded that these other activities are among the traditional uses and principal purposes for which state parks and forests are maintained.

In our recent case of *Leydon* v. *Greenwich*, supra, 257 Conn. 339–40, we considered whether a beach park

was a public forum. The park under consideration was "a town owned, 147 acre park facility that includes a beachfront on the Long Island Sound. The park area contains a number of ponds, a marina, a parking lot, open fields, a nature preserve, shelters, walkways and trails, and picnic areas with picnic tables. There also is a library book drop located on the beach." Id., 323. We concluded that, although the park had a natural element, namely, the beach and nature preserve, the marina, picnic areas, shelters, walkways and library book drop all facilitated public assembly and interaction. Accordingly, we determined that it was a public forum because it had many of the characteristics of a town common or municipal park, reflecting its developed character and its primary purpose to be used as such. Id., 342–43. Thus, we recognize that forum classification is determined by an examination of the traditional uses and principal purpose of the land in question, and is not controlled by the presence of some incidental characteristics typical of another type of forum. See *International Society for Krishna Consciousness, Inc.* v. *Lee*, 505 U.S. 672, 680, 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992) (religious and nonprofit groups' use of airports for distribution of literature, solicitation and proselytizing does not demonstrate airports traditionally used for free exchange of ideas); *United States Postal Service* v. *Council of Greenburgh Civic Assns.*, 453 U.S. 114, 131, 101 S. Ct. 2676, 69 L. Ed. 2d 517 (1981) (business and residential mailboxes not public forum; "it is a giant leap from the traditional 'soapbox' to the letterbox . . . and we do not believe the First Amendment requires us to make that leap").

In contrast to the beach park at issue in *Leydon*, state forests and undeveloped state parks are defined by their lack of any facilities for public assembly or interaction, and by the state's efforts to keep state forests and unde-

veloped state parks undisturbed and undeveloped. Like mailboxes and airports, the mere fact that state forests and undeveloped state parks are appealing locations for those seeking to convey a message does not make them public fora.

In support of their claim that state forests and undeveloped state parks should be classified as public fora, the defendants cite the example of national forests, which some courts have suggested are public fora. See *United States* v. *Rainbow Family*, 695 F. Sup. 294, 308 (E.D. Tex. 1988). The defendants' reliance on this comparison to national forests, however, is misplaced. First, the management of national forests reflects a conscious choice by authorities, in some instances, to provide a forum for public assembly and dialogue. See *United States* v. *Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000) (protest permitted anywhere in national forest except within 150 feet of temporary road construction zone); *United States* v. *Rainbow Family*, supra, 308 (regulations explicitly considered expressive activity). Second, national forests include facilities and features that are typical of developed public lands and that enhance public assembly and interaction. See *United States* v. *Johnson*, 159 F.3d 892, 894 (4th Cir. 1998) (national forest included campground). The state lands at issue in the present case, to the contrary, are undeveloped, and the state manages them with the primary goal of keeping them undisturbed.

The defendants argue, in the alternative, that state forests and undeveloped state parks are nontraditional public fora. Nontraditional public fora are state-owned properties that have not traditionally been dedicated to public discourse, but that the state has opened to be used for expressive activity. See *Perry Education Assn.* v. *Perry Local Educators' Assn.*, supra, 460 U.S. 45. Although a state is not required to open property as a public forum, once it does, and until the state

chooses to close it, the state is bound by the rules that govern traditional public fora. Id., 45–46.

The defendants presented evidence that the state permits expressive activity in some state-owned land, and they argued that this indicates that the state has opened the disputed property for use as a nontraditional public forum. Specifically, the defendants introduced evidence that the state has implemented a permit system for such nontraditional activities as walkathons, bikathons, bike races, foot races, hikes, canoe races, winter sports activities, other sporting events, horseback events, campouts, boating events, orienteering, fishing and hunting events, training exercises by police departments and military organizations, and events organized by ham radio operators and model plane operators. The state also has permitted more expressive activities, such as Native American celebrations, publication of opinions on environmental issues, historical reenactments, witchcraft, prayer meetings and even political fundraising events. Finally, the defendants note that the public enjoys open access to the disputed property without a permit.

This evidence is not persuasive for several reasons. First, the less expressive permit based activities such as orienteering, campouts and sporting events are activities based upon natural resources, take advantage of the undeveloped condition of the land and therefore fit neatly into the principal purpose for which the state manages the land. The purpose for using a permit system for such activities is that they involve large numbers of people and, therefore, must be managed and monitored so as to preserve the undisturbed condition of the land. Second, the permitted expressive activities described by the defendants, such as fundraisers and prayer meetings, take place in developed state parks, and therefore do not affect the forum classification of state forests and undeveloped state parks. There is no

space set aside in state forests and undeveloped state parks for the assembly of people. Finally, where expressive activity does take place in undeveloped state parks and state forests, it does not take place by virtue of a permit issued by the state. For example, the testimony about the practice of witchcraft in state forests indicates that it has taken place in secluded wooded areas because the practitioners have sought isolation from the general public, and not because they have sought to contribute their beliefs to the public dialogue. The fact that the state does not prohibit activities of that type when they do not interfere with state policies concerning the traditional uses of state forests and undeveloped state land does not mean that the state must permit any other expressive activity in those areas.

A state must intend to create a nontraditional public forum; the selective opening of a public property does not transform the property into a public forum. See *International Society for Krishna Consciousness, Inc.* v. *Lee*, supra, 505 U.S. 680 ("the government does not create a public forum by inaction"); *United States* v. *Kokinda*, 497 U.S. 720, 730, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990) ("a practice of allowing some speech activities on postal property [does] not add up to the dedication of postal property to speech activities"); *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc.*, supra, 473 U.S. 802 ("[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse"); *Perry Education Assn.* v. *Perry Local Educators' Assn.*, supra, 460 U.S. 47 ("We can only conclude that the schools do allow some outside organizations . . . to use the [school mail] facilities. This type of selective access does not transform government property into a public forum."); *Widmar* v. *Vincent*, supra, 454 U.S. 267 (university policy of encouraging active student groups and

accommodating meetings created public forum); *United States Postal Service* v. *Council of Greenburgh Civic Assns.*, supra, 453 U.S. 129 ("[S]ince 1934 access to [letterboxes] has been unlawful except under the terms and conditions specified by Congress and the Postal Service. As such, it is difficult to accept appellees' assertion that because it may be somewhat more efficient to place their messages in letterboxes there is a First Amendment right to do so."); *Madison Joint School District* v. *Wisconsin Employment Relations Commission*, supra, 429 U.S. 174–75 (school board meeting opened for public participation created public forum also open to teachers controlled by collective bargaining agreement); *Greer* v. *Spock*, 424 U.S. 828, 836, 96 S. Ct. 1211, 47 L. Ed. 2d 505 (1976) (allowing public access, permitting civilian speakers, clergy visits, art and theater exhibits on military base does not constitute dedication of base as public forum). "[T]he Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. . . . The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent." (Citation omitted.) *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc.*, supra, 802. Given the state's policy of maintaining the undisturbed nature of state land where hunting is allowed, we are not persuaded that the selective access permitted by the state evidences an intent to designate all state forests and parks as nontraditional public fora. Accordingly, we conclude that state forests are nonpublic fora.

## III

## SCOPE OF ACT AND STATE'S INTEREST

Having concluded that state forests and undeveloped state parks are nonpublic fora, we now consider

whether the act's restrictions on speech in those areas pass constitutional muster. In a nonpublic forum, the state may enforce time, place and manner regulations, and "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Education Assn.* v. *Perry Local Educators' Assn.*, supra, 460 U.S. 46. "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." (Emphasis in original.) *Cornelius* v. *NAACP Legal & Educational Defense Fund, Inc.*, supra, 473 U.S. 808. Because the defendants in the present case were arrested in a state forest, which we have concluded is a nonpublic forum, it would be appropriate for us to apply this reasonableness test. Because, however, the act also applies anywhere that it is legal to take game, including areas that may be public fora, to provide constitutional context for future cases, we also measure the act against the stricter standard reserved for public fora, e.g., whether the act is narrowly tailored to further a significant state interest. Applying that standard, we conclude that the act in dispute in this case does not violate the first amendment.

This court previously had deemed the act to be content-neutral, and the trial court found that the act is "narrowly tailored to serve a significant government interest, and leave[s] open ample alternative channels of communication." *Perry Education Assn.* v. *Perry Local Educators' Assn.*, supra, 460 U.S. 45. We agree with the trial court that the act satisfies that higher standard.

Our analysis of the act must address three issues: (1) the significance of the government interest purportedly served by the act; (2) whether the act is narrowly tai-

lored to serve that interest; and (3) whether the act leaves open ample alternative means of communication. Id. We first turn to the significance of the state's interest in the act.

The United States Supreme Court has defined several state interests as significant in the context of a restriction on speech, including "[t]he many functions performed by Selective Service certificates"; *United States* v. *O'Brien*, 391 U.S. 367, 380, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968); "state interests in ballot integrity and political stability"; *Timmons* v. *Twin Cities Area New Party*, 520 U.S. 351, 369–70, 117 S. Ct. 1364, 137 L. Ed. 2d 589 (1997); "having an undisrupted school session conducive to the students' learning"; *Grayned* v. *Rockford*, 408 U.S. 104, 119, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972); "the sufficiency of sound amplification at bandshell events"; *Ward* v. *Rock Against Racism*, 491 U.S. 781, 796, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989); "attempting to preserve the quality of urban life"; (internal quotation marks omitted) *Renton* v. *Playtime Theatres, Inc.*, 475 U.S. 41, 50, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986), quoting *Young* v. *American Mini Theatres, Inc.*, 427 U.S. 50, 71, 96 S. Ct. 2440, 49 L. Ed. 2d 310 (1976); and "maintaining the parks in the heart of [Washington, D.C.] in an attractive and intact condition . . . ." *Clark* v. *Community for Creative Non-Violence*, 468 U.S. 288, 296, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984).

We conclude that the state's interests in public safety, raising revenue, wildlife management and protection of the right of citizens to hunt, which are the interests served by the act in the present case, are as significant as the interests identified in those cases. The state offered particularly compelling evidence relative to the role of hunting as a forest and wildlife management tool. Increased development in the state of Connecticut has resulted in an ecosystem that is no longer self-balancing. In particular, the deer population is not natu-

rally controlled by predators, leaving regulated hunting as the most cost efficient, effective means of controlling the deer population, according to the collective experience of the fifty states. The control of the deer population, in turn, has a trickle down effect on many other areas of significant state interest. It prevents over-browsing in state forests and on state residents' ornamental plantings. Indeed, a state biologist testified that an uncontrolled deer population could strip forests of their ground growth and young trees in a matter of decades. Hunting also helps to control the population of geese, coyotes and a variety of small game.

The state also identified several other interests that are served by the act. The act benefits public safety both by reducing contact between activists and hunters where hunters are about to or are in the process of discharging firearms and bows, and also by reducing the number of collisions between cars and deer. In addition, regulated hunting and fishing produces significant revenue for the state. In the last fiscal year before the 1994 hearing on remand from this court, the state received $4.2 million in revenue from hunting, fishing and trapping licenses. The budget for the fish and wildlife division of the department of environmental protection was $4.9 million. Furthermore, fewer deer, raccoons, and geese limit transmission of rabies and Lyme disease. Controlling the goose population also avoids elevated levels of e.coli bacteria in water that often result from the feces of concentrations of geese. Finally, the state has an interest in providing recreational opportunities for its citizens, including hunting, trapping and fishing. In the year before the hearing, approximately 200,000 hunting, fishing and trapping licenses were issued in Connecticut. We are persuaded by this evidence that the state has a significant interest in supporting regulated hunting, trapping and fishing.

We next turn to the question of whether the act is narrowly tailored to further the state's significant interests. The method of regulation used by the state need not be the least intrusive. "[O]ur cases quite clearly hold that restrictions on the time, place or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." (Internal quotation marks omitted.) *Ward* v. *Rock Against Racism*, supra, 491 U.S. 797. In *State* v. *Linares*, supra, 232 Conn. 345, this court analyzed a similar statute that prohibited making noise intentionally to interfere with the legislative process. We concluded that the statute was sufficiently narrow because, under the statute, "an individual is never subject to arrest or prosecution for 'making unreasonable noise' outside the presence of an official legislative proceeding unless that person intends *and* effects an actual interference with that proceeding." (Emphasis in original.) Id., 373; see also *Grayned* v. *Rockford*, supra, 408 U.S. 119 (statute limiting protests outside schools narrowly tailored because "Rockford punishes only conduct which disrupts or is about to disrupt normal school activities"). We conclude that the act is similarly narrowly tailored to protect the act of taking game. First, it is limited to prohibiting interference with the lawful taking of wildlife "at the location where the activity is taking place with intent to prevent such taking." General Statutes § 53a-183a (a). Second, although it broadly addresses the many ways in which that interference might occur, each section of the act is strictly limited to actions that are intended to interfere with, or actually interfere with, the lawful taking of wildlife. Thus, the act is narrowly tailored to protect the one act, the actual taking of wildlife, upon which all of the state's interests depend.[5]

---

[5] The defendants argue that the act sweeps too broadly and burdens substantially more speech than necessary to protect the state's interest. In support of this proposition, the defendants primarily rely upon *Schenck* v. *Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 117 S. Ct. 855, 137 L.

Finally, we must consider whether the act leaves open sufficient alternative means of communication. We conclude that it does. The defendants' evidence on this issue essentially consists of testimony that approaching hunters where and when they plan to hunt is the most effective means of reaching their intended audience. Other options such as advertising, the defendants argue, are too expensive and not sufficiently focused on the audience with whom they wish to communicate. Moreover, the defendants claim, their other efforts to contact hunters directly, such as speeches at fish and game clubs, have met with indifferent or even hostile audiences. In support of their claim, the defendants rely on *Meyer* v. *Grant*, 486 U.S. 414, 424, 108 S. Ct. 1886, 100 L. Ed. 2d 425 (1988) ("Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication").

We disagree with the defendants on this issue. The defendants' evidence neither proves that they are prohibited from individual communication with hunters nor does it prove the absence of alternative means of communicating their antihunting message. In *Renton* v. *Playtime Theatres, Inc.*, supra, 475 U.S. 43, the plaintiff owners of an adult theater challenged a city ordinance that prohibited them from locating their theater within 1000 feet of any residential zone, single or multiple family dwelling, church, park or school. The plaintiffs argued that the ordinance did not leave open ample alternative means of communication because "practi-

Ed. 2d 1 (1997), which involved floating buffer zones at abortion clinics, for the proposition that there is constitutional protection of face-to-face communication. The defendants' argument, in an effort to make the act seem more burdensome than it actually is, implies that the act prohibits individual contact between the defendants and hunters. This simply is not true. The act prohibits only actions that are intended to interfere with the lawful taking of game.

cally none" of the remaining land was for sale or lease and there was no commercially viable theater site on it. The United States Supreme Court first noted that the ordinance left 520 acres where an adult theater could be located, which was 5 percent of the land in the city of Renton, Washington. The court then stated, "[t]hat [the plaintiffs] must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. . . . [W]e have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices." (Citation omitted.) Id., 54. Similarly in the present case, the state is protecting the lawful taking of game and has not completely prohibited the defendants from communicating their message to hunters. Like the plaintiffs in *Renton*, the defendants in the present case have had their speech restricted only to the degree necessary to prevent interference with taking game. That they therefore must fend for themselves in the marketplace of ideas does not give rise to a first amendment violation. We conclude that the act leaves open ample alternative means of communication.

The judgment is affirmed.

In this opinion the other justices concurred.